**SPARTUS CORPORATION,**
**Plaintiff-Appellee,**
**Cross-Appellant,**

v.

**The S/S YAFO, her engines, tackle, etc.,**
**in rem, and Defendant.**

**ZIM ISRAEL NAVIGATION COMPANY,**
**LTD., in personam, Defendant-Third-Party Plaintiff-Appellant, Cross-Appellee,**

v.

**LOUISVILLE & NASHVILLE RAILROAD COMPANY, Third-Party**
**Defendant-Appellee.**

No. 76–1691.

United States Court of Appeals,
Fifth Circuit.

March 7, 1979.

James L. Schupp, Jr., Benjamin W. Yancey, New Orleans, La., for defendant-third party plaintiff-appellant and S/S Yafo.

Brunswick G. Deutsch, New Orleans, La., for Spartus Corp.

Harry McCall, Jr., Gerald D. Wasserman, New Orleans, La., for Louisville & Nashville Railroad Co.

Before INGRAHAM, GEE and TJO-FLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

In the proceedings below, the district court entered judgment in favor of Spartus Corporation (Spartus) against Zim Israel Navigation Company, Ltd. (Zim) in personam and against Zim's vessel, the *S/S Yafo*, in rem for $83,939.36 in damages sustained to a shipment of clock movements while in transit from Ashod, Israel, to Louisville, Mississippi. On Zim's third-party indemnity claim against the Louisville and Nashville Railroad (L & N), judgment was entered for L & N. A brief recital of the facts and the proceedings in the district court are necessary to point up the issues now before us.

I

Spartus, a division of L.C.A. Corporation, is engaged in the business of manufacturing clocks. At the time of the transaction that gave rise to this litigation its plant was located in Louisville, Mississippi. Spartus's manufacturing process called for it to ship parts from its Louisville plant to Rolis Electric, Ltd. (Rolis), a subsidiary of L.C.A. in Tel Aviv, Israel, for assembly into functional clock movements. These clock movements were then shipped back to Spartus's Louisville plant via the port of New Orleans, Louisiana, where they were installed in clocks.

On April 22, 1974, Rolis delivered a shipment of clock movements, consigned to Spartus, to Zim at the port of Ashod, Israel. The movements had been placed by Rolis in small cartons and sealed by it in a twenty-foot steel container provided by Zim. Upon receipt of the sealed container, Zim issued Rolis a bill of lading [1] carrying the following description of the cargo received: "1 CONTAINER STC [said to contain] 385 CARTONS ELECTRIC CLOCK MOVE-MENTS." Thereafter the container was loaded upon the *S/S Yafo* for shipment to the destination called for by the bill of lading—New Orleans, Louisiana.

About ten days out of Miami, Florida, the Israeli government instructed Zim to direct the *S/S Yafo* to proceed to Mobile, Alabama, where it was to unload its cargo, take on certain military supplies, and return to Israel. Zim complied, directing the vessel to proceed to Mobile. The *S/S Yafo* arrived in Mobile on May 24, 1974. The container of clock movements was offloaded, without notice to Spartus, the consignee, and was left on an unsheltered dock until June 6, 1974. On that date, Zim delivered the container to L & N for transshipment to New Orleans. The container remained in L & N's piggyback yard in Mobile until June 10, 1974. The next day it was transported to New Orleans. There the container remained in L & N's custody until June 18, when it was handed over to a truck line for delivery to a local wharf. The container remained on the wharf, exposed to the elements until July 5, 1974. On that date, United States Customs inspectors broke the seal on the container, opened it and found some of the contents to be wet. The container was closed pending a further survey which was eventually conducted when the cargo arrived at Spartus's plant in Louisville. The survey disclosed some holes in the roof of the container, that the cartons inside were wet or water stained, and that the clock movements were rusted and corroded from exposure to fresh water. The parties stipulated that: 1.87 inches of rain fell in Mobile while the container sat on the open docks there; the same amount fell in New Orleans from June 11 to June 18; and from that date to July 5, when the seal was broken by the customs inspectors, the container was exposed to further rainfall.

Spartus subsequently brought this suit against Zim and the *S/S Yafo*, and Zim impleaded L & N for indemnity. Following a bench trial, the district court concluded

---

[1] Though the bill of lading was issued to Rolis, not a party to this case, it is not disputed that Spartus, by virtue of its business relationship with Rolis, stands in the latter's shoes.

that the offloading of the container of clock movements in Mobile constituted an unreasonable deviation, thereby subjecting Zim to liability for damages to Spartus. Despite the deviation, the court held that the $500 per-package limitation on liability provided by section 4 of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5) (1970),[2] was available to the carrier, Zim. The limitation was of no effect, however, because none of the 385 cartons, each of which the court treated as a separate "package," was worth as much as $500. The court rejected Zim's contention that it was absolved of responsibility under the Limitation of Liability Act, 46 U.S.C. §§ 181–189 (1970),[3] because of Rolis's failure to notify it of the true character and value of the clock movements when the initial bill of lading issued in Israel. The court found alternatively (1) that the statute did not embrace clock movements such as these, (2) that the clock movements were sufficiently described on the bill of lading to satisfy the statute and the separate movements were of such little value as to render de minimus the failure of Rolis to state their value, and (3) that the unreasonable deviation precluded the carrier's invocation of the Limitation of Liability Act. On Zim's third-party indemnity claim, the court found that Zim failed to sustain its burden of proving that it delivered the clock movements to L & N in good condition, an essential element of its cause of action.

In this appeal, Zim questions the court's findings with respect to deviation, the $500 COGSA per-package limitation, and the application of the Limitation of Liability Act. Zim also claims error in the trial court's finding that it failed to prove that it delivered the clock movements to L & N in good condition. Spartus has cross appealed, contending that COGSA's $500 per-package limitation is unavailable in a case of unreasonable deviation. We affirm the judgments on both the main suit and the third-party action.

## II

The first question we must decide is whether the district court was correct in concluding that the offloading of the cargo container at Mobile constituted an unreasonable deviation. For guidance we look to the general maritime law and to COGSA. The following is a frequently used definition of deviation:

To deviate, lexicographically, means to stray, to wander. As applied in admiralty law, the term "deviation" was originally and generally employed to express the wandering or straying of a vessel from the customary course of the voyage, but in the course of time it has come to mean any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased, such as carrying the cargo on the deck of the ship contrary to custom and without the consent of the shipper, delay in carrying the goods, *failure to deliver the goods at the port named in the bill of lading* and carrying them farther to another port, or bringing them back to the port of original shipment and reshipping them. Such conduct has been held to be a departure from the course of agreed transit and to constitute a "deviation" whereby the goods have been subjected to greater risks, and, when lost or damaged in consequence thereof, clauses of exceptions in bills of lading limiting liability cease to apply.

2. Section 1304(5) provides, in pertinent part,

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . .

3. Section 2 of the Limitation of Liability Act, 46 U.S.C. § 181 (1970), provides, in pertinent part,

If any shipper of . . . watches, clocks, or timepieces of any description . . .

shall lade the same as freight or baggage, on any vessel, without at the time of such lading giving to the master, clerk, agent, or owner of such vessel receiving the same a written notice of the true character and value thereof, and having the same entered on the bill of lading therefor, the master and owner of such vessel shall not be liable as carriers thereof in any form or manner . . . . (emphasis added.)

*G. W. Sheldon & Co. v. Hamburg Ameri-kanische Packetfahrt A.G.*, 28 F.2d 249, 251 (3d Cir. 1928) (emphasis added) (citations omitted). To determine whether a carrier's deviation for the purpose of unloading cargo (as occurred here, when the *S/S Yafo* put in to the Port of Mobile) is *unreasonable*, we need look no further than to COGSA. It provides, in relevant part,

Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however, That if the deviation is for the purpose of* loading or *unloading cargo* or passengers *it shall, prima facie, be regarded as unreasonable.*

46 U.S.C. § 1304(4) (1970) (emphasis after "Provided, however," added).

■ Zim concedes that the diversion of the ship to Mobile for the offloading of its cargo was not for the benefit of Spartus. In fact, the sole reason for the action was Zim's desire to enhance Israeli military preparedness. As Zim's operations manager, who ordered that the voyage be aborted, explained, the decision to divert to Mobile to offload the commercial cargo and take on military cargo (e. g., tanks and personnel carriers) was motivated solely by "moral pressure" and was in no way occasioned by any war-like emergency in Israel. Record, vol. 3, at 92–93. Thus the narrow question is presented: Is it a defense to the prima facie case of unreasonableness created by COGSA to say that the deviation was accomplished for the purpose stated by Zim. We think not.

We start with the premise that Congress, in deciding that a deviation for the purpose of unloading cargo is prima facie unreasonable, must have concluded that it is against the interests of the shipper, who has contracted to have his cargo delivered to its destination in good condition, for the carrier to alter that contract by offloading the cargo elsewhere. Thus, Congress has declared that a shipper can make out a case of

unreasonable deviation simply by proving that his cargo was offloaded at a place other than the stipulated destination. Zim has cited no authorities, and our research discloses none, that would allow a carrier to overcome the prima facie case of unreasonableness created by the statute by showing that the deviation was motivated by patriotism. Zim points to a seminal British case, *Foscolo, Mango & Co. v. Stag Line, Ltd.*, [1931] 41 Lloyd's List L.R. 165 (H.L.), as support for its defense, particularly Lord Atkin's statement that a deviation "may be reasonable even though it is made solely in the interests of the ship or solely in the interest of the cargo or indeed in the direct interest of neither . . . ." *Id.* at 171.

Zim's argument initially assumes that the term "interests of the ship" is broad enough to include the patriotic motivations of the ship's owner; once this is acknowledged, the argument continues, a trial court is entitled to find that even where, as in this case, the deviation is solely in response to this "interest," the deviation is reasonable. We find nothing in Lord Atkin's opinion that even suggests that the term "interests of the ship" should be construed to embrace an interest such as the one Zim proposes.

■ Even if we treat Zim's diversion of the *S/S Yafo* to Mobile as having been motivated by a desire to enhance Zim's financial stability, and perhaps even its corporate survival in the homeland, our conclusion remains the same—it is no defense to the prima facie case of unreasonableness. As a leading admiralty authority points out,

The rationale of [COGSA's prima facie] rule . . . seems to be that the carrier ought not be allowed to deviate with no other motive than the increase of his own revenues; thus, the proof required to overcome the *prima facie* unreasonableness of such a deviation would have to show something more than mere reasonableness from the point of view of the *carrier* . . . . The carrier, throughout the performance of the voyage, is always subject to [COGSA's] Section 3(2) duty to care for and carry the goods properly, and his decision on a route

would seem to be improper and unreasonable whenever it is made in disregard of that duty.

G. Gilmore & C. Black, *The Law of Admiralty* 179 (2d ed. 1975) (emphasis in original). We have reviewed all the facts and circumstances surrounding the *S/S Yafo*'s deviation, *see, e. g., Hellenic Lines, Ltd. v. United States,* 512 F.2d 1196, 1206–09 (2d Cir. 1975), and conclude that the district court was correct in holding that the motive behind Zim's deviation is no defense to Spartus's prima facie case of unreasonableness.

### III

■ The district court concluded that, despite the unreasonable deviation, Zim could avail itself of COGSA's $500 per-package limitation of liability. COGSA provides, in pertinent part:

*Amount of liability; valuation of cargo*

Neither the carrier nor the ship shall *in any event* be or become liable for *any* loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mentioned in this paragraph may be fixed: *Provided,* That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.

46 U.S.C. § 1304(5) (1970) (emphasis in first paragraph added). The district court read this provision as allowing the $500 limita-

tion *regardless* of the cause or circumstances of the loss. In its cross appeal, Spartus contends that the unreasonable geographic deviation of the *S/S Yafo* operated to breach the contract of carriage between Zim and Spartus, thereby rendering COGSA's per-package limitation inapplicable altogether. We think Spartus's contention is well made.

Prior to the passage of COGSA a geographic deviation had the effect of ousting the contract of carriage and imposing a harsh insurer's liability upon the carrier for damage resulting to the shipper's cargo. *See The Willdomino v. Citro Chemical Co. of America,* 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927); *St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral Commercial Do Rio de Janeiro,* 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201, 1923 A.M.C. 1131 (1923); *The Delaware,* 81 U.S. (14 Wall.) 579, 20 L.Ed. 779 (1872). *See generally* Morgan, *Unreasonable Deviation under COGSA,* 9 *J. Mar. L. & Com.* 481 (1978). With the passage of COGSA, however, considerable debate ensued as to the effect (on this principle of liability) Congress intended in employing the language "Neither the carrier nor the ship shall in any event be . . . liable for any loss or damage to . . . goods in an amount exceeding $500 per package."

■ COGSA wrote into law, with some modifications, the so-called Hague Rules, which operate as model standards governing the carriage of goods by sea under bills of lading.[4] The original draft of the Hague Rules, written in 1921, was the product of shippers, cargo underwriters, bankers, steamship owners and other interested parties whose intent was to strike a bargain between the cargo interests and the carriers for the division of risks incident to the transportation of goods. All recognized the need for international uniformity in ocean bills of lading, particularly the establishment of an irreducible minimum of immunity of the carrier. The original draft was

---

4. The history of COGSA is set out in the hearings and committee reports of both houses considering the legislation. *See* Carriage of Goods by Sea: Hearing on S. 1152 Before the Senate Committee on Commerce, 74th Cong., 1st Sess. (1935); S. Rep. No. 742, 74th Cong., 1st Sess. (1935); H. R. Rep. No. 2218, 74th Cong., 2d Sess. (1936).

refined by the International Maritime Conference and became the Brussels Convention that was signed by the United States and other nations in 1923. Great Britain enacted its Carriage of Goods by Sea Act in 1924, adopting in toto the Brussels Convention as its domestic legislation. The United States adopted its version (*i. e.*, COGSA) of the Brussels Convention in 1937. Perhaps the major impetus to COGSA's enactment was the seemingly insufferable condition imposed upon shippers (and, in turn, upon their insurers) by clauses in bills of lading limiting the carrier's liability to very low amounts. These clauses were thought to be the natural result of the carriers' superior bargaining position vis-a-vis shippers.

For several years after the enactment of COGSA many sectors of the maritime world continued to operate under the assumption that COGSA had effected no change in the law of deviation-based carrier liability. This and other circuits continued to apply insurer's liability to a carrier guilty of an unjustifiable deviation, *see Romano v. West India Fruit & Steamship Co.*, 151 F.2d 727, 730 (5th Cir. 1945); *The Lafcomo*, 64 F.Supp. 529, 531 (S.D.N.Y.1946)(both citing pre-COGSA case law such as *The Willdomino*), in spite of the $500 per-package limitation that seemingly applied to every loss.

How a carrier could be held liable for a sum in excess of $500 in a case of unreasonable deviation when COGSA provides that his loss cannot exceed $500 "in any event" was first addressed in *Jones v. The Flying Clipper*, 116 F.Supp. 386, 1954 A.M.C. 259 (S.D.N.Y.1953). Faced with seemingly unequivocal statutory language, the court nevertheless seized upon its perception of Congress's intent and found that Congress did not intend to supplant the existing law of deviation. The enactment of COGSA's $500 per-package limitation was viewed by the court as merely a means of insuring that no lesser amount of liability could be stipulated. As the court explained,

> [e]xcept for this change in amount, the provision of the Act did not represent any basic departure from existing law. Nei-

ther the Convention nor the Act contains any provision concerning the legal result of an unjustifiable deviation. There is nothing in the history of the Act to indicate that Congress by fixing the limitation at $500 intended to displace the doctrine of unjustifiable deviation which was so firmly entrenched in maritime law. Such a drastic change in the existing law, with its far-reaching consequences in the commercial and financial world would have been expressed in clear and unmistakable terms.

*Id.* at 388–89 (footnote omitted). In reaching its holding the court quoted Senator White, one of COGSA's major proponents, to the effect that the act worked only four changes in the preexisting law, *e. g.*, the Harter Act, 27 Stat. 445 (1893): "Four principal changes in the law will be worked by the legislation: The first one has reference to the limit of liability. Under this provision I should say generally that the limit of liability of the carrier is substantially increased." 116 F.Supp. at 389 n.11 (quoting 79 Cong.Rec. 13341 (1935)). The district court also relied on *Foscolo, Mango & Co. v. Stag Line, Ltd.*, [1931] 41 Lloyd's List L.R. 165 (H.L.). There, the House of Lords, after having found an unreasonable deviation, went on to reject the contention that the carrier was entitled to limit his liability. Their reasoning, according to the district court, was based in large part on the notion that an unreasonable deviation breaches the contract of carriage, thereby making the voyage different from the one called for in the original bill of lading (to which the British act applied). The holding of *The Flying Clipper* has been consistently reaffirmed by courts in the Second Circuit. *See Rosenbruch v. American Export Isbrandtsen Lines, Inc.*, 543 F.2d 967, 971 (2d Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976); *Iligan Integrated Steel Mills, Inc. v. SS John Weyerhaeuser*, 507 F.2d 68, 72 (2d Cir. 1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975); *Du Pont de Nemours International S. A. v. S.S. Mormacvega*, 493 F.2d 97, 100 n.9 (2d Cir. 1974); *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422

F.2d 7, 18 (2d Cir. 1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); *Mitsubishi International Corp v. S.S. Glyfada Spirit*, 1978 A.M.C. 480 (S.D.N.Y.1978); *cf. Cerro Sales Corp. v. Atlantic Marine Enterprises, Inc.*, 403 F.Supp. 562, 566 (S.D.N.Y.1975) (unreasonable deviation deprives the carrier of the benefit of the one-year statute of limitations).

Though we have not yet been called upon to decide whether an unreasonable geographic deviation nullifies COGSA's per-package limitation, we have considered whether an unreasonable deviation in the form of on-deck stowage in the face of a clean bill of lading has this effect. In *Searoad Shipping Co. v. E. I. duPont de Nemours & Co.*, 361 F.2d 833 (5th Cir.), *cert. denied*, 385 U.S. 973, 87 S.Ct. 511, 17 L.Ed.2d 436 (1966), we held that such a non-geographic (quasi) deviation ousts the COGSA limitation and restores the carrier's full insurer liability. Chief Judge Brown, speaking for the court, said,

> And although one highly respected authority raises a question whether under Cogsa the awesome insurer consequence should now be visited on the vessel for nongeographical deviations, and one Court of Appeals keeps a statutory, if not a contract, limitation alive, we have no doubt that the insurer liability continues after Cogsa to flow from on-deck deviation where the damage is causally related.

*Id.* at 835–36 (footnotes omitted). We read Judge Brown's statement that the "insurer consequence should now be visited on the vessel for nongeographical deviations" as a strong implication that insurer consequences necessarily flow from *geographic* deviations, COGSA's $500 per-package limitation notwithstanding. Subsequent cases in this circuit have also declined to apply the COGSA limitation in cases of unreasonable deviations, whether geographic or non-geographic (quasi). *See Siderurgica Del Orinoco C. A. v. M/V North Empress*, 1977 A.M.C. 1140, 1142–43 (E.D.La.1976); *International Drilling Co., N. V. v. The M/V Doriefs*, 291 F.Supp. 479, 486–87 (S.D.Tex. 1968); *cf. Baker Oil Tools, Inc. v. Delta Steamship Lines, Inc.*, 562 F.2d 938, 940 (5th Cir. 1977) (carrier's unilateral cancellation of port of call terminates contractually incorporated COGSA $500 limitation as to pre-loaded goods, thus rendering carrier a fully liable common law bailee).

Zim urges us not to treat *Searoad* as controlling our disposition here. Rather, it would have us adopt the view of the Seventh Circuit expressed in *Atlantic Mutual Insurance Co. v. Poseidon Schiffahrt, G. m. b. H.*, 313 F.2d 872 (7th Cir.), *cert. denied*, 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53 (1963). There the court declined to follow the *Flying Clipper* doctrine and held that the COGSA limitation applies notwithstanding the presence of an unreasonable geographic deviation. The court viewed the COGSA words "in any event" as an explicit congressional command that the $500 per-package limitation should apply to any loss, regardless of the cause. While this view is not altogether untenable, we are convinced that our holding in *Searoad* forecloses our adoption of it in this case. In sum, we agree with Spartus's contention that Zim's offloading of the clock movements in Mobile breached the contract of carriage and rendered the $500 per-package limitation a nullity. Because of this holding, it is unnecessary for us to consider Zim's contention that the district court erred in finding that each of the 385 cartons of clock movements constituted a package for the purpose of applying the limitation.

## IV

We now turn to Zim's contention that section 2 of the Limitation of Liability Act, 46 U.S.C. § 181 (1970), absolutely absolves it of any liability for the damage to the clock movements because Rolis failed to notify it of the nature and value of the cargo. The relevant portion of the Act provides:

> If any shipper of . . . *watches, clocks, or timepieces of any description* . . . shall lade the same as freight or baggage, on any vessel, without at the time of such lading giving to the master,

clerk, agent, or owner of such vessel receiving the same a written notice of the true character and value thereof, and having the same entered on the bill of lading therefor, the master and owner of such vessel shall not be liable as carriers thereof in any form or manner . . . . .

(emphasis added.) *See Calderon v. Atlas S.S. Co.*, 170 U.S. 272, 280, 18 S.Ct. 588, 591, 42 L.Ed. 1033 (1898). The district court found alternatively (1) that the clock movements were not "watches, clocks, or timepieces of any description;" (2) that, if they were, adequate notice that the shipment consisted of clock movements was given in the bill of lading (Rolis being entitled to omit a statement of value since the value of the individual movements was de minimus); and (3) that the *S/S Yafo*'s unreasonable deviation rendered the act inapplicable. We think the district court was correct in its first alternative holding; consequently, we need not reach the others.

We have been pointed to no cases interpreting "watches, clocks, or timepieces of any description." It is necessary, therefore, to begin with the plain meaning of the words of the statute, *see Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 n.29, 98 S.Ct. 2279, 2296, 57 L.Ed.2d 117 (1978), to determine whether the shipment of clock movements should properly be included within the statutory definition. The resolution of that issue is, we think, obvious. A timepiece is "an instrument (as a clock or watch) for measuring time." *Webster's Third New International Dictionary (Unabridged)* 2395 (1961). The clock movements shipped by Spartus were in need of further manufacture before they could be a part of a timepiece. Indeed, it is apparent from examining the exhibits that these little clock movements are simply motors that could be used to run any number of devices.

Zim argues that the statute's plain meaning includes the clock movements since it contains the phrase "of any description." We are not persuaded by this contention. Plainly, an article which is not a timepiece cannot be considered a timepiece "of any description." The phrase refers to different types of timepieces, not components thereof. That the aggregate value of the cargo was substantial, a factor to which Zim seems to attach particular significance, cannot defeat the plain and obvious meaning of the words employed in the statute.

In drafting section 181, Congress included, along with "watches, clocks, or timepieces of any description," a variety of goods, among them "silks *in a manufactured or unmanufactured state.*" 46 U.S.C. § 181 (1970) (emphasis added). Had Congress intended that the statute embrace clock movements such as those in this case, they could have provided a more expansive definition as they did for silk. We must decline Zim's invitation to interpret section 181 to encompass components of unfinished timepieces.

V

We now turn to Zim's final claim of error, the district court's disposition of its third-party indemnity claim against L & N. The district court dismissed the claim because it felt Zim had not shown that it delivered the cargo of clock movements to the railroad in Mobile in good condition. In our view, the ruling was correct.

The liability of a rail carrier for damage to goods is controlled by federal law. 49 U.S.C. § 20(11) (1970) provides, in pertinent part:

Any . . . railroad . . . receiving property [for interstate transportation] . . . shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it . . . . .

The Supreme Court has construed this statute to mean that, "in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows *delivery in good condition,* arrival in damaged condition, and the amount of damages." *Missouri Pacific Railroad v. Elmore & Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1145, 12 L.Ed.2d 752 (1964) (emphasis added). Thus, as the trial

judge properly noted, the issue here is whether Zim established that the shipment in question was delivered to the L & N in good condition.

The railroad issued Zim a "clean" bill of lading upon receipt of the container of clock movements.[5] Zim argues that the railroad's issuance of the clean bill is, standing alone, sufficient evidence of good condition to satisfy Zim's burden of proof. With the addition of the undisputed evidence that the goods arrived at Spartus's Louisville plant in a damaged condition and that their container, while in L & N's possession, was exposed to enough rainfall to account for the damage, Zim's argument proceeds, the district court had no choice other than to hold the railroad accountable.

Zim's argument is impressive, but it ignores the fact that it had the burden of proof to demonstrate delivery in good condition. First, although a bill of lading can establish prima facie that the merchandise being shipped is in good condition, *United States v. Mississippi Valley Barge Line Co.*, 285 F.2d 381, 388–89 (8th Cir. 1960), the "apparent good condition" clause, commonly contained in a bill such as the one here, has been held to apply only to those portions of the shipment which are visible and open to inspection. *Blue Bird Food Products Co. v. Baltimore & Ohio Railroad*, 474 F.2d 102, 104 (3d Cir. 1973). *See also World Wide Meats, Inc. v. Chicago & North Western Transportation Co.*, 383 F.Supp. 807, 809–10 (N.D.Iowa 1974). In this case, the container was sealed and the clock movements were not available to L & N for inspection. Consequently, the "apparent good condition" clause provided Zim with no proof that the clock movements had been delivered to the L & N in good condition. That proof had to come from elsewhere, and, as the district court correctly observed, Zim did not provide it.

Zim did show, and L & N conceded, that it received the clock movements from Rolis, in Israel, in good condition. As to how the shipment was handled or whether it was exposed to the elements (especially fresh water, as that is what caused the damage) during the voyage from Israel to Mobile, the record is silent. We do know that, in Mobile, prior to its delivery to the railroad, the shipment was exposed to 1.87 inches of rain. This history of the shipment is the sum of Zim's evidence, or lack of it, bearing on the condition of the shipment when delivered to L & N. Zim had the burden of proof on the issue. On this record, we cannot say that the district judge was clearly erroneous in concluding that Zim did not establish, by a preponderance of the evidence, that the clock movements were delivered to the railroad in good condition. Judgment for the L & N on the third-party claim was therefore in order.

### VI

The judgments for Spartus in the main suit and for L & N on the third-party claim are, for the reasons we have stated, AFFIRMED.

---

5. The bill of lading provided, inter alia, "The property described below in apparent good order, *except as noted* (*contents* [this portion of original exhibit obliterated by hole punch] *con-dition of contents of packages unknown*) . . . ." Defendant's Exhibit No. 3 (emphasis added).