**GENERAL ELECTRIC COMPANY IN-
TERNATIONAL SALES DIVISION,**
Plaintiff-Appellee,

v.

**S.S. NANCY LYKES, her engines, boilers,
etc. and Lykes Bros. Steamship Compa-
ny, Inc., Defendants-Appellants.**

No. 809, Docket 82–7709.

United States Court of Appeals,
Second Circuit.

Argued Feb. 7, 1983.

Decided April 20, 1983.

Hollis M. Walker, Jr., New York City (Walker & Corsa, New York City, Vera E. Weinberg, Harold V. Higham, New York City, of counsel), for defendants-appellants.

John E. Cone, Jr., New York City (Bigham, Englar, Jones & Houston, New York City, Helen M. Benzie, Lawrence B. Brennan, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD and CARDAMONE, Circuit Judges, and ZAMPANO, District Judge.*

* Honorable Robert C. Zampano, United States Senior District Judge for the District of Connecticut, sitting by designation.

LUMBARD, Circuit Judge:

Carrying on its deck three 50 to 52 ton locomotive cabs shipped by General Electric Company International Sales Division ("GE") to Taiwan, the S.S. Nancy Lykes, on a voyage from the Gulf Coast to Kobe, Japan and the Far East, ran into heavy seas and winds soon after leaving the port of San Pedro-Long Beach, California on May 4, 1978. In the early morning of May 5, 1978, two of the locomotive cabs broke their bindings and were washed overboard.

Invoking admiralty jurisdiction, GE commenced this action against the vessel and its owner, Lykes Bros. Steamship Company ("Lykes"), on June 13, 1980. GE asserted that the call at San Pedro was a deviation from the Nancy Lykes' published itinerary and from the customary routes taken by vessels traveling from the Gulf to the Far East via the Panama Canal and that the deviation led to the vessel's encounter with the adverse weather which caused the loss of the locomotive cabs. Arguing that the Nancy Lykes ran a substantially higher risk of adverse weather conditions by proceeding to the Far East from San Pedro rather than along the customary routes to Kobe, GE asserted that the deviation was not reasonable under the circumstances and thus constituted a breach of the contract of carriage under the terms of § 4(4) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1304(4) (1976).

On April 15, 1982, after a three day bench trial, Judge Lasker, finding that the vessel's call at San Pedro did not constitute a reasonable deviation allowed by terms of § 4(4) of COGSA, held Lykes liable for the full amount of the loss, including the cost of shipping replacement cabs to Taiwan.[1] 536 F.Supp. 687 (S.D.N.Y.1982). Essential to this holding was Judge Lasker's determination that the stop of the Nancy Lykes at San Pedro was a deviation which unjustifiably exposed the vessel and its cargo to significantly greater risks of adverse

1. GE also contended that the locomotive cabs were not properly secured on deck, but it does not challenge Judge Lasker's ruling that it had not sufficiently proved this allegation.

weather, thereby rendering the deviation unreasonable.

Lykes asserts that Judge Lasker erred in finding an unreasonable deviation, and that, in any event, Judge Lasker improperly held that recovery was not limited to the $500 per package liability limitation contained in the contract of carriage and in § 4(5) of COGSA, 46 U.S.C. § 1304(5) (1976).

We agree with Judge Lasker's thorough decision and thus affirm the judgment.

## I.

The basic facts are not in dispute. On April 16, 1978, three locomotive cabs manufactured by GE were loaded onto the deck of the Nancy Lykes in New Orleans pursuant to a bill of lading which provided for shipment to Keelung, Taiwan. The locomotive cabs were 56 feet long, 10 feet wide, 13 feet high, and weighed between 50 and 52 tons. The bill of lading, which incorporated the provisions of COGSA, allowed the locomotive cabs, which could not be stowed below deck because of their great bulk, to be secured and stowed on deck. The bill of lading also contained in paragraph 3 a standard "liberties" clause, which defined the scope of the voyage as including "usual, customary, or advertised ports, whether herein named or not, and ports in or out of the advertised, geographical, or usual route or order," and specifically allowed the vessel to "call at any port . . . [to] take fuel oil . . . ."

Kobe, Japan was to be the Nancy Lykes' first port of call in the Far East, with an estimated arrival date of May 11, 1978. Prior to departure of the vessel from the Gulf Coast, Lykes decided to send the Nancy Lykes to the port of San Pedro to obtain the more than 12,000 barrels of bunker fuel ("bunkers") necessary to complete the voyage to Kobe.

San Pedro, approximately 2,900 miles north of the Panama Canal, was not an advertised port on the Nancy Lykes' pub-lished itinerary, and the decision to send the vessel there was never communicated to GE or otherwise made known to the shipping community. Lykes acknowledges that in making the decision to send the Nancy Lykes to San Pedro, it never considered any factor other than the advantage of less expensive fuel prices that had become available at that port in early 1978, and it concedes that there was an ample supply of slightly more expensive bunker fuel at New Orleans and at other ports on the Nancy Lykes' route from the Gulf to the Panama Canal.

In fact, the Nancy Lykes had never before bunkered at San Pedro while voyaging from the Gulf Coast to the Far East, and of Lykes' forty or more vessels, only two had ever previously stopped at San Pedro solely to take on bunker fuel during such a voyage: the S.S. Dolly Thurman on March 22, 1978 and the S.S. Brinton Lykes on March 30, 1978. Moreover, although at least 30 of GE's locomotive cabs had previously been transported by Lykes' vessels to the Far East, GE was not informed of the routes taken by these vessels and had no knowledge whether they called at ports other than those specified in their published itineraries.

Pursuant to Lykes' instructions, the Nancy Lykes, after transiting the Panama Canal, voyaged to San Pedro and there obtained 12,877 additional barrels of bunker fuel. On May 4, 1978, the vessel departed San Pedro on a route that took it to the north of that port and soon encountered rough waters and gale force winds which measured between 8 and 10 on the Beaufort Scale.[2] At 0430 on May 5, 1978, two of the three locomotive cabs broke their lashings and were washed overboard within three minutes of each other. The loss occurred at 34° N to 35° N and 121° W, a position close to the California coast. Having suffered no major structural damage, the vessel completed its voyage to the Far East.

---

2. In relevant part, the Beaufort Scale is as follows:

| Beaufort Number | Wind Speed in | |
| --- | --- | --- |
| | Knots | Miles Per Hour |
| 8 | 34–40 | 39–46 |
| 9 | 41–47 | 47–54 |
| 10 | 48–55 | 55–63 |

Pursuant to its agreement with the Taiwan Railway Administration, the purchaser of the locomotive cabs, GE was required to replace the lost cabs at a cost of $1,709,000, which included $71,000 for ocean freight to Taiwan.

## II.

■ Finding that the Nancy Lykes had engaged in an unreasonable deviation by bunkering at San Pedro, Judge Lasker held Lykes liable for the loss of the locomotive cabs on the basis of § 4(4) of COGSA, 46 U.S.C. § 1304(4) (1976), which provides:

> Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable. [Emphasis in original].

This section clearly implies that any *unreasonable* deviation is to be treated as a breach of COGSA and the contract of carriage. *Nemeth v. General Steamship Corp.,* 694 F.2d 609, 613 (9th Cir.1982); *see also Rosenbruch v. American Isbrandtsen Lines, Inc.,* 543 F.2d 967, 971 (2d Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976); *DuPont de Nemours International S.A. v. S.S. Mormacvega,* 493 F.2d 97, 101 (2d Cir.1974). Lykes challenges Judge Lasker's finding of an unreasonable deviation for three reasons: (1) the liberties clause in the bill of lading allowed the bunkers call at San Pedro without regard to the terms of § 4(4); (2) the bunkers call was not a deviation; and (3) even if a deviation, the bunkers call was not unreasonable. We see no merit in Lykes' contentions.

## A. *Effect of the Liberties Clause*

■ Lykes argues that in light of the broad liberties clause contained in paragraph 3 of the bill of lading, the Nancy Lykes' call for bunkers at San Pedro cannot under any circumstances be considered a breach of COGSA or the contract of carriage. In relevant part, the liberties clause provided:

> The scope of the voyage herein contracted for shall include usual, customary, or advertised ports, whether herein named or not, and ports in or out of the advertised, geographical, or usual route or order, even though in proceeding thereto the ship may sail beyond the port of discharge, or in a direction contrary thereto, . . . or depart from the direct or customary route. The ship may call at any port . . . [to] take fuel oil, . . . and all of the foregoing are included in the contract voyage.

Reasoning that liberties clauses must be consistent with § 4(4)'s treatment of reasonable and unreasonable deviations, Judge Lasker held that these clauses, like § 4(4), only permit reasonable deviations from the anticipated journey. We agree.

Even before COGSA was enacted in 1936, it was well settled that liberties clauses, though broad in language, were limited in scope. *See, e.g., The Willdomino,* 300 F. 5, 18 (3d Cir.1924), *aff'd sub nom. The Willdomino v. Citro Chemical Co.,* 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927); *The Blandon,* 287 F. 722, 725 (S.D.N.Y.1922). Because liberties clauses refer to the voyage contemplated by the parties, and not to a different voyage determined unilaterally by the carrier, these clauses have long been interpreted to give the carrier only a limited right to deviate when such a deviation is reasonable under all the circumstances. *See, e.g., Hellenic Lines, Ltd. v. United States,* 512 F.2d 1196, 1206 (2d Cir.1976); *The San Giuseppe,* 122 F.2d 579, 582–84 (4th Cir.1941); *The Willdomino, supra,* 300 F. at 18; *The Blandon, supra,* 287 F. at 725; *see also* G. Gilmore & C. Black, The Law of Admiralty 178 (2d ed. 1975).

A construction of liberties clauses that allowed carriers to deviate with impunity would seriously erode the carrier's primary duty under § 3(2) of COGSA, 46 U.S.C. § 1303(2) (1976), to "properly . . . carry . . .

[and] care for ... the goods carried," and thus would be contrary to COGSA's design of forbidding carriers from contracting out of liability for their own wrongdoing. *See Hellenic Lines, Ltd. v. United States, supra,* 512 F.2d at 1206; *see also* G. Gilmore & C. Black, *supra,* at 178. Indeed, COGSA's legislative history clearly reveals an intent to limit by statute the ability of carriers, through the use of broad liberties clauses, to set their own standards of proper carriage. The 1936 report of the House Committee on Merchant Marine and Fisheries, noting that the purpose of COGSA was to "fix[ ] an irreducible minimum of immunity of the carrier from liability," H.R.Rep. No. 2218, 74th Cong., 2d Sess. 1 (1936), commented:

> It is common in bills of lading to provide in general terms for the utmost latitude to the vessel in making a voyage. This is so changed by [section 4(4) of] the bill [COGSA] that *deviations from the contracted voyage are restricted to* deviation for the purpose of saving life or property at sea and *any reasonable deviation.*

*Id.* at 7 (emphasis supplied).

We agree, therefore, with Judge Lasker that liberties clauses must be construed to permit only reasonable deviations and that the presence of such a clause in the bill of lading did not give Lykes any deviation rights beyond those allowed by § 4(4) of COGSA.

### B. *The Question of Deviation*

■ We also agree with Judge Lasker that the Nancy Lykes' call for bunkers at San Pedro constituted a deviation. As Judge Lasker found, San Pedro was never advertised as a port of call in the vessel's published itinerary and was not on the ordinary trade routes from the Panama Canal to Kobe and the Far East. This finding was confirmed by the testimony of Lykes' own weather routing expert. Moreover, Judge Lasker found that at least for vessels operating on scheduled liner services such as the Nancy Lykes, bunkers at that time were normally obtained only at ports advertised in the vessel's itinerary.[3]

Lykes acknowledges that a deviation results when a vessel " 'wander[s] or stray[s] ... from the customary course of the voyage,' " *Spartus Corp. v. S.S. Yafo,* 590 F.2d 1310, 1313 (5th Cir.1979) (quoting *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt,* 28 F.2d 249, 251 (3d Cir.1928)); *see also* G. Gilmore & C. Black, *supra,* at 177, but argues that the Nancy Lykes' bunkers call at San Pedro was not a deviation from the usual routes on the ground that the vessel's course from San Pedro in fact merged with and followed the northernmost customary route when the vessel reached mid-ocean at 170° W to 180° W. We disagree.

Lykes' contention not only disregards Judge Lasker's finding with respect to the bunkering customs of liner services, but ignores the fact that San Pedro and the site of the casualty are close to 120° W, and at that point the vessel was approximately 600 miles and 1320 miles north, respectively, of the northernmost and southernmost customary routes from the Canal to the Far East.[4] Numerous cases have held similar or smaller route variations to be deviations. *See, e.g., The Willdomino v. Citro Chemical Co.,* 272 U.S. 718, 727–28, 47 S.Ct. 261, 262, 71 L.Ed. 491 (1927) (vessel traveled 300 miles north of the customary trade route from Lisbon to New York to obtain bunkers at North Sydney, Nova Scotia); *World Wide Steamship Co. v. India Supply Mission,* 316 F.Supp. 190, 192 (S.D.N.Y.1970) (during voyage from Gibraltar to the Suez Canal vessel called at port of Piraeus,

---

3. The district court found that the evidence established that liner services, as opposed to "tramp" ventures, hold themselves to a high degree of schedule exactness upon which the shipping community relies. Thus, liners do not seek bunkers at ports not advertised since such a diversion would normally delay the vessel.

4. San Pedro and the site of the loss are in the region of 33° N to 35° N and 118° W to 121° W. At 120° W, the northernmost and southernmost customary routes from the Canal to the Far East are near 25° N and 13° N respectively.

Greece for additional cargo, thereby adding 184 miles to the voyage and delaying the vessel at least 3 days); *The Frederick Luckenbach,* 15 F.2d 241, 243 (S.D.N.Y.1926) (vessel, on route from Colon, Panama to Mobile or New Orleans, left the customary route and made a trip to Neuvitas, Cuba, thereby increasing the length of the journey by over 400 miles); *The Maine,* 8 F.2d 291, 292 (S.D.N.Y.1924) (vessel called at New York for inexpensive bunkers on a voyage from Galveston to Gibraltar).

■ Also lacking merit is Lykes' contention that the prior bunkers calls at San Pedro in March 1978 of two of its vessels, the Dolly Thurman and the Brinton Lykes, rendered that stop customary for vessels voyaging from the Gulf to the Far East. A course will only be considered customary when the route is *"established and by all means published to the world."* W.R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha, 12 F.2d 519, 521 (9th Cir.) (emphasis supplied), cert. denied, 273 U.S. 717, 47 S.Ct. 109, 71 L.Ed. 856 (1926); see also The Frederick Luckenbach, supra, 15 F.2d at 243. Certainly, the bunkers calls at San Pedro of these two Lykes vessels on Gulf to Far East voyages do not make that stop customary. There is no evidence that the previous bunkers calls at San Pedro of the Dolly Thurman and the Brinton Lykes were made known to GE or generally published to the shipping community, and it is undisputed that GE did not know that such a stop was planned for the Nancy Lykes. Cf. Hostetter v. Park, 137 U.S. 30, 40, 11 S.Ct. 1, 4, 34 L.Ed. 568 (1890) (call at a port will not be a deviation where such stop is either revealed to the shipper or generally made known to the shipping community); *The Frederick Luckenbach, supra,* 15 F.2d at 243 (same). Beyond doubt, therefore, a call at San Pedro solely for bunkers on a Gulf Coast to Far East voyage was not customary at the time of the Nancy Lykes' voyage.[5]

5. The record indicates that soon after the Nancy Lykes' voyage, Lykes and other liner services, seeking to take advantage of the lower fuel prices offered at San Pedro, began to advertise San Pedro as a port of call on Gulf to Far East voyages. Indeed, by June 1981,

## C. The Reasonableness of the Deviation

■ The reasonableness of the Nancy Lykes' deviation from the customary route depends on an assessment of all the surrounding circumstances. *See The Willdomino, supra,* 300 F. at 19; Squillante & Zimmerman Sales, Inc. v. Puerto Rico Marine Management, Inc., 516 F.Supp. 1049, 1053 (D.P.R.1981), aff'd mem., 685 F.2d 421 (1st Cir.1982); Surrendra (Overseas) Private, Ltd. v. S.S. Hellenic Hero, 213 F.Supp. 97, 101–02 (S.D.N.Y.), aff'd, 324 F.2d 955 (2d Cir.1963) (per curiam); American Cyanamid Co. v. Booth Steamship Co., 99 F.Supp. 232, 237 (S.D.N.Y.1951), aff'd sub nom. Feuer v. Booth Steamship Co., 195 F.2d 529 (2d Cir. 1952) (per curiam). Judge Lasker found that the Nancy Lykes, by stopping at San Pedro rather than voyaging directly from the Panama Canal to the Far East, was assured, no matter what route was taken to the Far East from San Pedro, of passing through regions north of 30° N and near the California coast in which there was a known and increased risk of encountering adverse weather during the springtime months. In so finding, Judge Lasker accepted GE's evidence which showed that the customary routes to the Far East were generally calmer during springtime and thus that the risk of unfavorable weather conditions would have been significantly reduced had the vessel not deviated. Judge Lasker also found that Lykes should have been forewarned of the dangers of deviating to San Pedro by the experiences of the Dolly Thurman and the Brinton Lykes which, in calling at San Pedro in the early springtime, had encountered bad weather on courses to and from that port respectively. These findings are supported by the record and are not clearly erroneous.

■ We agree with Judge Lasker that, under all the circumstances, the Nancy

Lykes' vessels had made over 100 stops at San Pedro on such voyages. Of course, these later developments have no bearing on whether a customary route to San Pedro in fact existed at the time of the Nancy Lykes' voyage.

Lykes' deviation to San Pedro to obtain inexpensive bunkers was unreasonable. In *The Waalhaven,* 36 F.2d 706 (2d Cir.1929), *cert. denied,* 281 U.S. 747, 50 S.Ct. 352, 74 L.Ed. 1159 (1930), a pre-COGSA case, we held that the vessel was liable for cargo damage resulting from a deviation taken to obtain inexpensive bunker fuel when the carrier's decision to deviate knowingly exposed the vessel without justification to the dangerous ice fields which caused the casualty. We noted that the ice fields were a "danger to which she [the vessel] had no right to expose the shippers" and that the "ship's duty was to sail direct, avoiding the ice, as was entirely practicable." *Id.* at 709. In another pre-COGSA case, *The Frederick Luckenbach, supra,* the court held the vessel liable for damage to cargo caused by a hurricane encountered on the course of a deviation when the deviation, the purpose of which was merely to discharge cargo, took the vessel on "a course which involved well-known difficulties and dangers of navigation, all of which would have been avoided by taking the direct and usual course...."[6] 15 F.2d at 243. These cases suggest that a deviation is unreasonable, thereby breaching the contract of carriage, when, in the absence of significant countervailing factors, the deviation substantially increases the exposure of cargo to foreseeable dangers that would have been avoided had no deviation occurred. *See also* G. Gilmore & C. Black, *supra,* at 179 ("The carrier ... is always subject to the § 3(2) [of COG-

SA, 46 U.S.C. § 1303(2) (1976)] duty to care for and carry the goods properly, and his decision on a route would seem to be improper and unreasonable whenever it is made in disregard of that duty."). We conclude, therefore, that the Nancy Lykes' deviation to San Pedro, which subjected the cargo to a known and substantially increased probability of adverse weather for the sole purpose of allowing Lykes to realize fuel cost savings, was unreasonable.

### III.

Lykes argues that even if the Nancy Lykes engaged in an unreasonable deviation, thereby breaching the contract of carriage and § 4(4), Lykes is nonetheless entitled to limit its liability to $500 per package pursuant to the terms of § 4(5) of COGSA, 46 U.S.C. § 1304(5) (1976). We agree with Judge Lasker that Lykes is liable for the full amount of the loss.

■ Section 4(5) of COGSA reads in relevant part:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.[7]

It is undisputed that, prior to COGSA's enactment, an unreasonable deviation,

---

**6.** Lykes attempts to undercut the pertinence of *The Frederick Luckenbach* by noting that the court there focused on the construction to be given to liberties clauses and held the vessel liable to all but one of the shippers only after determining that none of the liberties clauses in the bills of lading, with the exception of one which was similar to the liberties clause in the instant case, was broad enough to authorize a deviation from the usual course. *See* 15 F.2d at 244. We believe, however, that the court's holding of liability is relevant to our examination of the reasonableness of the Nancy Lykes' deviation, especially in light of our conclusion in part II.A. that all liberties clauses only allow reasonable deviations.

**7.** Section 4(5) of COGSA applies in this case not as a matter of law but as a matter of

contract. Because the bill of lading issued to Lykes expressly provided for carriage of cargo on deck, the locomotive cabs are not in fact "goods" covered by § 4(5). *See* COGSA § 1(c), 46 U.S.C. § 1301(c) (1976) ("The term 'goods' includes goods, wares, merchandise, and articles of every kind whatsoever, except ... cargo which by the contract of carriage is stated as being carried on deck and is so carried."). However, since the provisions of COGSA are fully incorporated in the instant bill of lading, § 4(5) is applicable as a contractual term. *See Jones v. The Flying Clipper,* 116 F.Supp. 386, 388 (S.D.N.Y.1953) ("[The bill of lading] defines the rights, duties, exemptions, and limitations of the parties, whether imposed by statute or the result of voluntary agreement.").

whether geographic or otherwise, deprived the carrier of all liability limitations on the ground that such deviations ousted the contract of carriage and made the carrier fully responsible for the cargo as an insurer. *See, e.g., The Willdomino v. Citro Chemical Co., supra,* 272 U.S. at 725, 47 S.Ct. at 262 (geographic deviation); *St. Johns N.F. Shipping Corp. v. S.A. Companhia Geral Commercial Do Rio de Janeiro,* 263 U.S. 119, 124, 44 S.Ct. 30, 31, 68 L.Ed. 201 (1923) (quasi-deviation of stowing goods on deck in contravention of bill of lading providing for below deck stowage); *see also* G. Gilmore & C. Black, *supra,* at 176–77, 180. In the first post-COGSA case to address this issue, Judge Weinfeld determined that, at least where the loss was causally related to the deviation, COGSA was not intended to change the existing law, and accordingly he held that an unreasonable deviation deprives the carrier of the benefit of section 4(5)'s liability limitation. *Jones v. The Flying Clipper,* 116 F.Supp. 386, 388–90 (S.D.N.Y.1953). Explicitly adopting the rule of *The Flying Clipper,* we have held that "it is the law of this Circuit that any ... unreasonable deviation from the contract of carriage will deprive the carrier of ... [the § 4(5)] statutory limitation of liability." *DuPont de Nemours International S.A. v. S.S. Mormacvega, supra,* 493 F.2d at 100 n. 9; *see also Encyclopaedia Brittanica, Inc. v. S.S. Hong Kong Producer,* 422 F.2d 7, 18 (2d Cir.1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). Other circuits are in accord. *Nemeth v. General Steamship Corp., supra,* 694 F.2d at 612–13 (9th Cir.); *Spartus Corp. v. S.S. Yafo, supra,* 590 F.2d at 1316–17 (5th Cir.). *But see Atlantic Mutual Insurance Co. v. Poseidon Schiffahrt,* 313 F.2d 872, 874–75 (7th Cir.), *cert. denied,* 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53 (1963).

Lykes urges us to abandon *The Flying Clipper* rule on the ground that modern marine insurance has eliminated the need for depriving the carrier of the benefit of the liability limitation. One of the underlying reasons for the traditional rule affirmed in *The Flying Clipper* was that the shipper lost its insurance coverage when the vessel

deviated. *The Flying Clipper, supra,* 116 F.Supp. at 389; *see also* G. Gilmore & C. Black, *supra,* at 181–82. Lykes argues that because modern marine insurance policies usually contain clauses which provide that the risks of deviation are covered, *see* G. Gilmore & C. Black, *supra,* at 182, there is no longer any justification for the rule. *See also Singapore Navigation Co. v. Mego Corp.,* 540 F.2d 39, 45 (2d Cir.1976) (Oakes, J., dissenting). We disagree.

■ Unlike ordinary risks of shipping such as negligence in the stowage or handling of cargo or lack of due diligence in making the vessel seaworthy, unreasonable deviations are "fundamental breach[es] which go[] to the very essence of the undertaking," *The Flying Clipper, supra,* 116 F.Supp. at 390, since they expose cargo to "unanticipated and additional risks." *Id.* at 389; *cf. Nemeth v. General Steamship Corp., supra,* 694 F.2d at 613 ("[m]ere negligence in the stowage or handling of cargo ... might be considered an inherent risk of shipping"). It follows that a deviation which unjustifiably exposes cargo to unanticipated risks is such a serious breach of the contract of carriage that the carrier must be deprived of the protection of the § 4(5) liability limitation. *See Nemeth v. General Steamship Corp., supra,* 694 F.2d at 613.

Indeed, exposing carriers which engage in unreasonable deviations to the risk of full liability has the salutary effect of discouraging such deviations. On the other hand, to allow carriers to limit their liability when an unreasonable deviation causes damage to cargo not only would weaken the carrier's primary duty of care to cargo under § 3(2) of COGSA, 46 U.S.C. § 1303(2) (1976), but would render meaningless the § 4(4) distinction between reasonable and unreasonable deviations. *See Mitsui & Co. v. American Export Lines, Inc.,* 636 F.2d 807, 815 (2d Cir.1981). Such a result is not warranted. *See id.* ("In interpreting § 4(5), courts must ... take a critical look at any proposed construction ... that would reduce a carrier's liability below reasonable limits."). We see no reason, therefore, to abandon a

rule the ultimate effect of which is to preserve and enforce the underlying policies of COGSA.

Affirmed.