**SEAROAD SHIPPING COMPANY and the Claimant, Searoad (Bahamas) Ltd., Appellants,**

v.

**E. I. duPONT de NEMOURS AND COMPANY, Incorporated, Appellee.**

No. 22169.

United States Court of Appeals
Fifth Circuit.

May 26, 1966.

Rehearing Denied July 18, 1966.

W. F. Parker, Miami, Fla., for appellants.

Richard F. Ralph, Miami, Fla., for appellee.

Before JONES and BROWN, Circuit Judges and BREWSTER, District Judge.

JOHN R. BROWN, Circuit Judge.

The District Court in this libel for cargo damage cast the M/V Sealane in rem and her owners in personam for the total loss of a deck-loaded cargo of high explosives resulting from heavy weather on the short voyage from Key Largo in the Florida Keys to Freeport, Grand Bahama Island. The Court did so on the basis that deck-loading the cargo covered by a clean, under-deck bill of lading amounted to a deviation making the vessel an insurer. The Court also found unseaworthiness in the manner of stowage in view of weather conditions which could be expected for that season. The shipowner attacks, as it must, both grounds. Unseaworthiness is challenged on the ground that while one could expect to encounter winds up to 55 k. p. h. with resulting heavy seas at that season, a specific inquiry at the Weather Bureau on the eve of departure elicited a favorable forecoast for the expected duration of that short voyage. As to deviation, the shipowner urges two things. First, notations on the shipping documents—bills of lading and shipping export declarations—indicated that the goods were to be stowed under the direction of the Coast Guard and this meant that by approving on-deck stowage, the Coast Guard necessarily certified that under-deck stowage, was not permissible. Second, this one followed about eight prior shipments loaded, to the Shipper's [1] knowledge, on deck, so that the Shipper either consented to on-deck stowage, or the practice was so prevalent on shallow craft bound for these nearby islands as to amount to a custom of the port to ship on-deck despite under-deck clean bills of lading.

As we conclude the District Court was warranted in finding deviation, we affirm without reaching the unseaworthiness problem.

The M/V Sealane, we understand, is a converted LCI, approximately 150 feet in length, 24 feet beam, draft of 7 feet with a freeboard of about 5 feet. She has two under-deck cargo holds. Prior to taking on the deck-loaded explosives at Key Largo, February 6, 1963, the general cargo had been loaded into the holds at Miami. The explosives were stowed inside a van trailer which, in turn, was loaded on the after deck of the vessel. The trailer was secured with eight chains and turnbuckles, four on each side.

The vessel got under way about 5:00 P.M., February 6, bound for Freeport, Grand Bahama Island, a voyage which would normally take about twelve hours. About 9:30 P.M. weather and seas worsened, and at approximately 11:45 P.M. one of the eight chains parted. About 4:00 A.M. the following morning, February 7, all chains on the port side of the trailer parted and the trailer and its contents went overboard. The Master estimated that winds got as high as 50 to 55 knots, although the Court found that they did not exceed 40 to 45 knots with seas not exceeding 7 to 10 feet.

The shipping documents covering the cargo of High Explosives [2] consisted of the Shipper's export declaration and the ocean bills of lading. These were physi-

---

1. The Shipper is E. I. duPont deNemours Company, Inc.

2. The cargo, as described on the bills of lading, consisted of 800 cases High Ex-

plosives—Dynamite and 50 cases Cordeau Detonant Fuse (primacord).

cally typed up, blanks filled in and otherwise completed by representatives of the Shipper. The Shipper's export declaration made reference to the Coast Guard[3] and the ocean bills of lading[4] bore the express certification by the Shipper concerning the dangerous character of the goods and the requirement that they be stowed under supervision of the Coast Guard.

As required by the Coast Guard Regulations issued pursuant to the Dangerous Cargo Act, 46 U.S.C.A. § 170, this cargo had to be loaded at Key Largo, the only authorized loading point, under the supervision of the Coast Guard after inspection of the vessel and issuance of the permit. The action of the Coast Guard is reflected solely by the official, certified copies of the certificate of inspections,[5] permit, and loading.[6]

With such ancient landmarks as The Delaware, 1872, 81 U.S. (14 Wall.) 579, 20 L.Ed. 779, and St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral Commercial Do Rio de Janerio, 1923, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201, 1923 AMC 1131, the shipowner recognizes that justifying on-deck shipment under a clean under-deck bill of lading is a formidable task. The Court, in St. Johns, after first stating that it was "not dealing with a case arising under a general port custom permitting above deck stowage notwithstanding a clean bill, with notice of which all shippers are charged," went on to lay down the long-recognized rule: "When there is no such custom and no express contract in a form available as evidence, a clean bill of lading imports under deck stowage." And here, as there, "[u]pon this implication * * * [the Shipper] had the right to rely." 263 U.S. at 124, 44 S.Ct. at 31, 68 L.Ed. at 203. And although one highly respected authority raises a question whether under Cogsa the awesome insurer consequence should now be visited on the vessel for nongeographical deviations,[7] and one Court of Appeals keeps a statutory, if not a contract, limitation alive,[8] we have no doubt that the insurer liability

---

3. Typed in was this certificate:
    "These commodities, licensed by U. S. for ultimate destination Grand Bahama Island * * * west end, for pick up at Freeport. Diversion contrary to U. S. law prohibited.
This was followed by:
    "To be loaded only under the supervision of the U. S. Coast Guard."
This was signed by W. J. Schneider, Sr., agent for the Shipper.

4. "This is to certify that the above articles are properly described by name and are packed and marked and are in proper condition for transportation according to the regulations established by the Commandant of the Coast Guard and/or Interstate Commerce Commission.
    E. I. duPont deNemours and Company, Inc.
    By    W. J. Schneider, Sr.
          Florida Agent."
The bills of lading contained the Cogsa Clause Paramount, 46 U.S.C.A. § 1312.

5. The Vessel Inspection Certificate checked as "OK," fire equipment, working gear, hold inspection and magazine inspection. Opposite the latter was penned in: "Trailer lashed to main deck." The Certificate also showed that bilge and engine room inspection was "dry and clean;" no conditions existed on the vessel that would affect an explosive operation; and the vessel was in condition to receive the explosives.

6. The Certificate of Loading attested that it had been loaded under the supervision of the Coast Guard Officer in accordance with the cargo plan, the manifest, and in compliance with applicable regulations, with no waiver by the Coast Guard of any navigation laws or regulations.

7. Gilmore & Black, Admiralty § 3–40, at 156 (1957), considering especially the impact of § 4(4) and the exemptions afforded under § 4(2) of Cogsa, 46 U.S.C.A. § 1304(2), (4).

8. See Atlantic Mut. Ins. Co. v. Poseidon Schiffahrt, G.m.b.H., 7 Cir., 1963, 313 F.2d 872, 1963 AMC 665, affirming N.D. Ill., 1962, 206 F.Supp. 15, 1963 AMC 669A. Rejecting Jones v. The Flying Clipper, S.D.N.Y., 1953, 116 F.Supp. 386, 1954 AMC 259, the Seventh Circuit holds the $500 per package limitation applicable notwithstanding a deviation.

continues after Cogsa [9] to flow from on-deck deviation where the damage is causally related.[10]

◼ We are clear that the shipowner's attempt to stem the tide of this formidable principle on the theory of the shipping document notations (note 3 & 4, supra) will not suffice. These notations are not in any sense a volitional act indicating some consensual agreement, express or implied. These are mandatory, flowing directly from the preemptory requirement of valid regulations. These are a part of the intricate statutory-regulatory structure [11] which aims at giving all persons in today's complex system of distribution meaningful notice as to the classification of the commodities within the hierarchy of dangerous goods so that mandatory or otherwise adequate safeguards can be taken to avoid or minimize the risk of injury to property or persons during transportation.

Thus, the regulations, applicable expressly to shippers, § 146.02–3, –5(c), require for export shipments that the shipper or his "duly authorized agent" prepare "an originating shipping order," [12] § 146.05–13, which must reveal, as a minimum, the "information required to be shown" by § 146.05–12 for domestic shipments.[13] The shipping documents are the source from which the carrier derives needed information, makes up the manifest and proposed stowage plans, etc., § 146.06–12, –14, –15, which are in turn, a part of the application for, and issuance of, the permit to load. § 146.20–85, –87(a), (b); 46 U.S.C.A. § 170(7) (e).[14] And the Shipper's certificate here noted on the bills of lading (note 4, supra) follows almost to the letter the precise wording required by § 146.05–11(c).

◼◼ Nor does the shipowner make any headway with that aspect of this theory that the Shipper, acknowledging or even certifying, that the cargo must be loaded under Coast Guard supervision thereby acquiesces in the type of stowage, above or under-deck, as approved by the Coast Guard. Of course, this theory rests on the assumption that in approving on-deck stowage, the Coast Guard necessarily declared that on-deck and on-deck only was permissible. Again, in no sense a volitional act, action by the Coast Guard is a legal mandate. The statute, 46 U.S.C.A. § 170(7) (e), and the regulations forbid loading of explosives at places or aboard vessels except as permitted by the Coast Guard, § 146.20–85, –87.

The stowage generally must be in accordance with that prescribed in the official Tables for the particular commodi-

---

**9.** Knauth leaves it in no uncertain terms. "It has become well settled that stowage of cargo on deck, when contrary to contract or custom of underdeck stowage, is such a fundamental breach of the contract of carriage as to displace the contract clauses which might benefit the carrier, and constitutes the carrier an insurer of the safe arrival of the goods at destination." Knauth, Ocean Bills of Lading 260 (1953).

**10.** Here, as in The Flying Clipper, note 8, supra, there is no doubt about the causal relation between the deviation and the damage. The M/V Sealane weathered the storm. Its underdeck cargo arrived safely. The reasonably heavy, but foreseeable, forces of nature did their damage because the cargo was deck loaded in a van trailer.

**11.** The regulations, Part 146—Transportation or Stowage of Explosives or Dangerous Articles or Substances, and Combustible Liquids on Board Vessels, 46 C.F.R. § 146.01 et seq., are promulgated by the Coast Guard pursuant to statutory direction, 46 U.S.C.A. § 170(7) (a), (b), (5), (6). In the scheme of the regulations dangerous articles are divided into 8 classifications, the major ones being: Explosives (§ 146.20–1 to –300); Inflammable Liquids (§ 146.21–1 to –100); Inflammable Solids and Oxidizing Materials (§ 146.22–1 to –100); Poisons (§ 146.25–1 to –400).

**12.** By note 1, this term includes " * * * (2) Ocean Bill of Lading." § 146.05–13.

**13.** See § 146.05–12(f) (1)–(8). Of particular importance is (f) (5) requiring use of the official authorized shipping name of each article as shown in the commodity list of regulations, § 146.04–1, –5.

**14.** The Shipper also has mandatory responsibilities as to labeling and marking of the goods for export. § 146.02–10(a); § 146.-05–15 to 17. See also 46 U.S.C.A. § 170(10).

ty. § 146.06–9(a). This is true specifically for explosives of classes A, B and C. § 146.20–100 to 300. Where the tables so permit, explosives may be stowed on deck, § 146.20–19, provided conditions 19(a) through (k) are satisfied. For neither Dynamite [15] nor Cordeau Detonant Fuses [16] did the Tables mandatorily require on-deck stowage. Consequently, § 146.06–9(b) [17] does not imperatively come into play. And this is so without regard to—and without our deciding—the effect it might conceivably have if, for a dangerous article moving under a clean under-deck bill of lading, the tables or other regulations inescapably required that the only permissible stowage would be on-deck. Nor is any of this changed by the terms of § 146.20–16, which permits the stowage of "small quantities of explosives" other than under-deck when " * * * (1) no other stowage is available." Certainly not on this silent record which merely reflected that the Coast Guard certified that stowage in the trailer van on-deck was permissible, not in any sense certifying—as the shipowner contends—that this was the only permissible stowage permitted.

■ Consequently, the Coast Guard Regulations, the Shipper's shipping document certifications, and the Coast Guard approval of this stowage do not carry the day.

■ That leaves only the contention that for the movement of explosives on shallow draft vessels to the nearby island ports, it was the custom of the port to ship them on-deck. The Trial Court, however, had ample basis for rejecting this. The proof was equivocal at best, one estimate suggesting only that approximately 50% moved under-deck. It was equivocal both as to the nature of the craft on which such cargoes moved and certainly it did not even begin to show as *St. Johns*, supra, implies, that for cargoes being transported pursuant to clean under-deck bills of lading, the custom was nevertheless for on-deck stowage.

■ The further effort to show that on-deck stowage was with the consent of the Shipper likewise foundered. In the first place, the Trial Court made rulings on exceptions to the shipowner's answer and later, consistent with rulings on pleadings, rulings on proffered evidence which severely narrowed the scope of proof. From our vantage many of these rulings seem perhaps to confuse an impermissible effort to vary the written contract by parole evidence with the permissible proof of circumstances showing an intentional waiver of the terms of a written contract by conduct.[18] We have no occasion to pass on the correctness of these rulings since none is urged as an error here. But the result was that all the Trial Court heard was that some eight shipments by this Shipper, covered by clean bills of lading, had moved to the islands by on-deck stowage. Practically no evidentiary details were revealed.

15. Listed as High Explosives, § 146.04–5, (note 2, supra) Table A § 146.20–100 calls generally for Magazine stowage.

16. Listed as Cordeau Detonant Fuse, § 146.04–5 (note 2, supra) Table C § 146.20–300 permits stowage:
"On deck under cover"
"Tween decks readily accessible"
"Under deck away from heat"

17. § 146.06–9(b). "When only one stowage is shown no other stowage shall be utilized. When more than one stowage is indicated any or all of the indicated stowage may be utilized. * * *"

18. Corbin makes very clear that neither the parol evidence rule, 3 Corbin, Contracts § 574 (1960 ed.), the Statute of Frauds 2 id. § 310, nor express provision in the written contract against waiver by subsequent oral agreement or conduct, 3A id. § 763, prevent the introduction of evidence that a party to the contract by subsequent conduct or agreement—oral or written—waived a condition to his performance of the contract. As clearly stated:
" * * * [A] provision that an express condition of a promise or promises in the contract cannot be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective. The promisor still has the power to waive the condition, or by his conduct to estop himself from insisting upon it, to the same extent that he would have had this power if there had been no such provision."
3A id. § 763, at 531.

Nor as to the shipments here in suit, or the other prior shipments, was there even a slight effort to show that acquiescence in deck stowage did, or could, amount to an authoritative waiver of under-deck shipment by one having requisite authority and awareness of the legal-practical significance of what was taking place.

█ The upshot was that the shipowner failed in all of these efforts to establish some basis for overcoming the law's implication that the clean, unclaused, bill of lading called for underdeck stowage. There being no legal justification for this on-deck stowage of cargo shipped pursuant to an under-deck clean bill of lading, this stowage amounted to a deviation casting the shipowner for the loss which was directly and causally related to the deck stowage. This makes it unnecessary to pass on the unseaworthiness holding.

Affirmed.