**ENCYCLOPAEDIA BRITANNICA, INC.,**
Plaintiff,

v.

**SS HONG KONG PRODUCER,** her
engines, etc.,

and

**Universal Marine Corporation, Defendant.**
**No. 65 Ad. 910.**

United States District Court
S. D. New York.
March 21, 1969.

Bigham, Englar, Jones & Houston, by F. Herbert Prem, New York City, for plaintiff.

Mendes & Mount, by John J. Sullivan, New York City, for defendant.

## OPINION

TYLER, District Judge.

This suit arises out of a shipment of books by plaintiff Encyclopaedia Britannica, Inc. ("Britannica") on the SS HONG KONG PRODUCER, which is owned by defendant Universal Marine Corporation ("Universal"). A trial was held before the court sitting without a jury on January 15 and 16, 1969. The following findings of fact and conclusions of law represent my decision on the merits of this controversy.

### Findings of Fact

1. On December 2, 1964, Britannica's agent, United Cargo Corp. ("United Cargo"), delivered to the HONG KONG PRODUCER eight metal containers in which had been placed 4,080 cartons of bound books for carriage to Britannica's affiliate in Japan. The books had been transported from Britannica's Chicago plant by motor truck to New York and there had been consolidated into the metal containers by United Cargo. The containers bore the following identification numbers: UCC 5120, UCC 5152, UCC 5223, UCC 5298, UCC 5330, UCC 5458, UCC 5496, and C–10344.[1] The shipment was received by defendant Universal in "apparent good order and condition." (Exhibit 5.)

2. On receipt of these metal containers, Universal issued a "short form" bill of lading which contained no notation on its face that any of the containers were to be carried on deck. The short form bill of lading (see Exhibit 5) states that:

"This Short Form Bill of Lading is issued for the shipper's convenience and at its request * * *",

and that:

"All the terms of the carrier's regular form of Bill of Lading are incorporated herein with like force and effect as if they were written at length herein."

The regular form bill of lading (see Exhibit 5) provides in part:

"The shipper represents that the goods covered by this bill of lading need not be stowed under deck and it

---

1. The first seven of these containers were 17′ x 8′ x 8′. The eighth, described as a "pallet container", was evidently smaller than the others.

is agreed that it is proper to and they may be stowed on deck unless the shipper informs the carrier in writing before delivery of the goods to the carrier that under deck stowage is required.

With respect to goods carried on deck, all risk of loss or damage by peril inherent in or incidental to such carriage shall be borne by the shipper * * * ".

Britannica neither notified Universal that it required under-deck stowage nor did it insert in the bill of lading any increased value for the shipment.

3. During transit, the HONG KONG PRODUCER encountered "boisterous" weather, and a considerable amount of seawater passed over its weather decks on numerous occasions. Six of the eight containers were shipped on deck, and, as the parties stipulated, "The aforesaid shipment sustained some damage by breakage and sea water while on board the SS HONG KONG PRODUCER."

4. The HONG KONG PRODUCER arrived at Yokohama on January 16, 1965. During the next two days, surveyors, at the request of defendant or its agent, inspected the cargo aboard the vessel. At several places in the surveyor's report (Exhibit 7), there was noted specific damage to containers 5152 and 5330. On page 1 of the report, it is said that on both containers "both sides were dented and broken." A similar remark was made on page 2, and the two containers were included in a schedule of damaged cargo with the notation "side broken, (about 2' x 8')". All six vans which were stowed on deck were included in this schedule of damaged cargo with the notation "on deck cargo."

5. On January 18, 1965, the subject cargo was discharged into two barges (see Exhibits 3A and 3B), and was taken to the warehouse used by Britannica's Japanese affiliate in Tokyo. It was transported there by United Cargo and arrived on January 19 or 20, 1965.

6. On January 22, 1965, a joint survey of the cargo was conducted at the warehouse by surveyors representing both parties. (Exhibits 4 and C.) The cartons had been removed from the containers prior to survey, apparently by employees or agents of Britannica. Containers 5152 and 5330 were outside the warehouse and were inspected; the remaining containers were unavailable. Over 1300 cartons were found by the surveyors to have come in contact with water. Four hundred twenty cartons containing Volumes 1–12 of the encyclopaedia and two hundred thirty-six cartons containing Volumes 13–24 were found to have sustained extensive damage, and the books therein were unmerchantable. The balance of the cartons which had contacted water sustained only slight damage to the cartons, and no claim has been made as to the books contained therein. Damage to the front and rear doors, the rubber packing, the top plate, the plywood panel and the sides of the two containers was noted.

7. Although there are several weak points in the plaintiff's proof on the question of "causation",[2] I am convinced by the totality of the evidence that the damage sustained to the encyclopaedias was caused by the rough seas encountered by the HONG KONG PRODUCER on its voyage.

*Conclusions of Law*

1. There was no breach of contract or, as articulated by plaintiff's counsel,

---

2. The proof is very thin on the condition of the books themselves when received by defendant. Cf. Koyo International Inc. v. S. S. Ootmarsum, 234 F.Supp. 424, 425 (S.D.N.Y.1964); Copco Steel & Engineering Co. v. S. S. Alwaki, 131 F.Supp. 332, 333 (S.D.N.Y.1955). Also, there is no indication in the record as to precisely what happened to

the books between the time they left the ship and the time they were inspected, a period of some three days. The books were removed from the containers by plaintiff's employees or agents so that the precise containers from which the extensively damaged books were taken cannot be ascertained.

"unreasonable deviation", by the defendant in transporting these books on deck to Japan because the contract of carriage (the bill of lading) provided that the carrier could ship on deck unless notified to the contrary by the shipper or its agent.

2. The defendant was not negligent in the manner in which it stowed and handled the subject cargo, nor is there any indication that the HONG KONG PRODUCER was unseaworthy at any relevant time. See 46 U.S.C. §§ 1303, 1304 (1936).

3. Accordingly, I conclude that the defendant is not answerable to the plaintiff for the damage sustained to the cargo during the voyage in question.

### The Breach of Contract Issue

Plaintiff's contention on the issue of liability is relatively clear. It claims that the defendant shipped its goods on deck notwithstanding its contract and contrary to the custom, and that the goods were damaged as a result of on-deck stowage. The pivotal issue of law in this case is whether there has been a breach of contract during the voyage by reason of defendant's on-deck stowage of the six metal containers. In fairness to the plaintiff, which has relied exclusively on this argument to establish liability, I will discuss this issue at some length.

■■■ Despite the understandable incursions of public law into admiralty cases involving contracts for the carriage of goods by sea, the basic legal relationship between shipper and carrier is one of private contract. Thus, it is not surprising that admiralty courts have come to recognize that certain fundamental breaches of performance by a carrier, frequently styled "unreasonable deviations", give rise to liability of the carrier for damage to the goods.[3] See Gilmore & Black, Admiralty, 156 (1957). A good example of such a breach or deviation occurs when the ship makes a substantial geographical departure from its scheduled route. See Gilmore & Black, *supra,* at 156–58.

■■ A related doctrine has emerged that if the parties contracted for under-deck stowage but the carrier shipped the cargo on a weather deck, liability for damage to the cargo will be imposed upon the carrier, at least for any damage causally related to shipment on deck.[4] See Gilmore & Black, *supra,* at 161–62. This doctrine is based upon the proposition that on-deck shipments incur substantially greater risks than do below deck shipments.

■■ Apparently it has been a long-standing custom in most ports in this country that a "clean" bill of lading, i. e. one that makes no mention of on-deck stowage, connotes under-deck stowage of general cargo.[5] See Searoad Shipping

3. For various reasons not important here, admiralty courts have even imposed an insurer's liability in these cases, i. e. the damage need not have been caused by the "unreasonable deviation."

4. In virtually all the cases concerning this type of breach of the shipping contract, the damage has been causally related to on-deck shipment. To my knowledge, none of the cases specifically hold that such a causal relationship is necessary, and some of the cases describe the breach as "unreasonable deviation." See Jones v. The Flying Clipper, 116 F.Supp. 386, 387 (S.D.N.Y.1953). In any event, as heretofore indicated, I have expressly found that weather deck stowage of two of the containers contributed to their damage.

5. My reasoning does not require me to consider the effect here, if any, of the fact that the cargo was loaded and sealed in metal containers by United Cargo before it was delivered to defendant's ship. However, I note in passing that containerization has already posed difficult questions for admiralty courts, see, *e. g.* Standard Electrica S. A. v. Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft, 375 F.2d 943 (2d Cir. 1967), and one can be fairly certain that changes in the custom and usage of the industry will have some effect on the law in this area.

Co. v. E. I. duPont du Nemours & Co., 361 F.2d 833, 835 (5th Cir.), cert. denied, 385 U.S. 973, 87 S.Ct. 511, 17 L.Ed. 2d 436 (1966); Jones v. The Flying Clipper, 116 F.Supp. 386, 387–388 (S.D. N.Y.1953). Thus, where the parties have made no mention of this element of their contract, failure by the carrier to stow general cargo below deck has been regarded as a breach or deviation, this term of the contract being supplied by custom.

The reason that this latter rule has no application to this case is simple: the bill of lading specifically addresses itself to the question of on-deck stowage, stating that " * * * it is agreed that it is proper to and they [the goods] may be stowed on deck * * * ". Givaudan Delawanna v. The Blijdendijk, 91 F. Supp. 663 (S.D.N.Y.1950), and cases cited therein.

 Here, as in *Givaudan Delawanna*, the plaintiff seems to be confused about the meaning of the term "clean bill of lading." In my opinion, Judge Kaufman there correctly stated the law in this area, and I agree with his conclusion, which follows.

"Considerable difficulty has been occasioned by the use of the term 'clean' bill of lading, due in all probability to the fact that the term has two meanings, one broad and one narrow. Broadly speaking, a 'clean' bill of lading is one which contains nothing written, stamped or printed in the margin qualifying the words of the bill of lading itself. * * * In the narrower sense, where a bill of lading with no qualifying words in the margin and with no provision in the bill of lading itself as to the manner of stowage is used, the import of such 'clean' bill of lading is that goods are to be secured under deck. * * *

Indeed, if a finding on this issue were required in this case, I would tend to the view that defendant, through its witnesses Rand and Sembler, established that in recent years there has been a growing practice of stowage of containerized cargo on weather decks of container ships and general cargo vessels.

It is conceded that the bill of lading issued in this case was 'clean' in the broader sense, that is, nothing was printed or noted in the margin. However, libelant seeks to make the broader usage of a 'clean' bill of lading synonymous with its narrower usage and thereby establish that under deck stowage was implied by this bill of lading; and therefore it concludes that the clause permitting on deck stowage was invalid.

A 'clean' bill of lading cannot import under deck stowage except in the absence of a specific provision as to stowage." [citations omitted.] 91 F. Supp. at 665.

 One final argument made by plaintiff must be considered. Britannica points to the fact that the regular form bill of lading containing the applicable contract term was incorporated by reference into the so-called "short form", and to the fact that the print on the long form bill of lading was fine. It then argues that it should not be held to have agreed to this clause, apparently because neither its employees nor its agents read the regular form bill of lading.[6] If this were an occasional and inexperienced shipper dealing directly with the carrier, such an argument might engender at least sympathetic consideration. But Britannica was and is no "babe" in the shipping "woods". It engaged an experienced shipping agent, United Cargo, to make final arrangements for passage to Japan. United Cargo deals with carriers, including the defendant, on a daily basis. It should be well acquainted with the provisions of the bills of lading used by the carriers. I think it is entirely proper to hold Britannica to the terms of the bill of lading, especially since it could have as-

6. It has been held that an innocent purchaser for value of a bill of lading takes with notice of the provisions of the bill. Givaudan Delawanna v. The Blijdendijk, 91 F.Supp. 663, 666 (S.D.N.Y.1950). It would seem that *a fortiori* the shipper must be held to such notice.

sured below deck stowage by merely notifying the defendant that such was required.

Decree or judgment for defendant.