SNC S.L.B., as subrogor of the Institute of London Underwriters and Gilles Bentin, Plaintiffs–Appellees,

v.

M/V NEWARK BAY, her tackle, boilers, engines, etc., M/V Sea Eagle, her tackle, boilers, engines, etc., and Leonhardt & Blumberg, Defendants,

Sea–Land Service, Inc., Defendant–Appellant.

No. 845, Docket 96–7826.

United States Court of Appeals, Second Circuit.

Argued Jan. 15, 1997.

Decided April 2, 1997.

---

M.E. DeOrchis, New York City (John A. Orzel, DeOrchis & Partners, New York City, on the brief), for defendant-appellant.

Stephan Skoufalos, New York City (Laurence E. Curran, Chalos & Brown, New York City, on the brief), for plaintiffs-appellees.

Before: VAN GRAAFEILAND, LEVAL and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

This is a "dropped yacht" case. It belongs to a subspecies of maritime case in which a shipper's yacht is dropped while being unloaded from a vessel.[1] In this case, the carrier asserts the $500-per-"package" limitation of liability provided for in the Carriage of Goods by Sea Act, 46 U.S.C.App. § 1300 *et seq.* ("COGSA"), incorporated into the contract of carriage by its terms. The shipper, in response, claims that the COGSA limitation of liability does not apply because the carrier's conduct—its "unreasonable deviation" from the projected route—constitutes a "fundamental" breach of the contract.[2] We conclude, after reviewing the record, that the finding of the United States District Court for the Southern District of New York (Allen G. Schwartz, *Judge*) that the carrier deviated unreasonably and was thus barred from invoking the otherwise-applicable COGSA limitation of liability, was not supported by the evidence. Accordingly, we vacate the judgment of the district court and remand the cause with instructions that it enter a judgment in favor of the plaintiffs for $500.

## I.

This action arises out of a contract of carriage, dated November 23, 1990, to trans-

---

1. *See, e.g., Royal Ins. Co. v. Sea–Land Serv. Inc.,* 50 F.3d 723, 725 (9th Cir.1995) (yacht dropped while being unloaded in Oakland, California); *Institute of London Underwriters v. Sea–Land Serv. Inc.,* 881 F.2d 761, 763 (9th Cir.1989) (yacht dropped while being unloaded in Tacoma, Washington); *Pearson v. Black King Shipping Co.,* 769 F.Supp. 940, 942 (E.D.Va.1991) (yacht dropped while being unloaded in Sri Lanka); *Miller Yacht Sales, Inc. v. M.V. Vishva Shobha,* 494 F.Supp. 1005, 1007 (S.D.N.Y.1980) (yacht dropped while being unloaded in Hoboken, New Jersey); *New Hampshire Ins. Co. v. Seaboard Marine, Ltd.,* No. 89–0255, 1992 WL 33861 (S.D.Fla. Jan. 2, 1992) (yacht dropped while being loaded onto vessel in Las Minas, Panama); *Jumbo Navigation, N.V. v. Melchior,* No. 89–0314, 1991 WL 133552 (S.D.Fla. Mar. 12, 1991) (yacht dropped while being unloaded in Miami).

2. *See General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80, 86–87 (2d Cir.1983); *Jones v. The Flying Clipper,* 116 F.Supp. 386, 390 (S.D.N.Y.1953) (Weinfeld, *J.*).

port a 37–foot yacht, the *Cover Girls* (the "yacht"), from Port Everglades, Florida, to Marseilles, France. The contract was between the defendant-appellant Sea–Land Services, Inc. ("Sea–Land" or "carrier"), a New Jersey corporation doing business at all relevant times within the Southern District of New York, and the shipper of the yacht, American Trading Industries, Inc. (the "shipper").

It is not disputed that the yacht was delivered to Sea–Land in good condition, loaded onto Sea–Land's *M/V Newark Bay* on or about November 29, 1990, and carried to Felixstowe, England, where it was transferred to a Sea–Land "feeder vessel," the *M/V Sea Eagle*, for shipment to Marseilles.[3] During this period, Sea–Land was in the process of reorganizing its services and routes in order to provide service, at a charge, to the United States Government in support of Operation Desert Shield, the military deployment of United States armed forces in the Persian Gulf in response to the 1990 Iraqi invasion of Kuwait. As a result of this reorganization, Sea–Land ordered the *Sea Eagle* to transfer the yacht to another feeder vessel at Lisbon, Portugal, for carriage to Marseilles. Sea–Land vessels rarely use Lisbon's port, where, unlike the nearby port of Algeciras, Spain, there are no separate Sea–Land facilities. On January 3, 1991, during an attempted transfer at Lisbon, the yacht was dropped and suffered extensive damage.

**3.** It was established at trial that Sea–Land employs a "feeder system" to transport cargo. Cargo is loaded onto a long-haul or "mother" vessel, which is used for trans-oceanic voyages to "feeder ports," where the cargo is either "transhipped" (if it is "break-bulk," or non-containerized, cargo) or "relayed" (if it is containerized cargo) onto smaller, "feeder vessels" for short-haul voyages to smaller or less frequented ports. In the instant case, the yacht was placed on a "flat-rack container" and was relayed in its container.

**4.** Paragraph 1 of the bill of lading reads in relevant part as follows:

1. CLAUSE PARAMOUNT. This bill of lading shall have effect subject to all the provisions of the Carriage of Goods by Sea Act ... as if set forth herein. The defenses and limitations of said act shall apply to goods whether

The bill of lading for the yacht contained a "clause paramount" incorporating by reference all of the provisions of COGSA.[4] Because COGSA applies only to goods stowed between decks or in the hold, *see* 46 U.S.C.App. § 1301(c), the bill of lading also included a separate clause applying COGSA specifically to goods carried above deck, *see Royal Ins. Co. v. Sea–Land Serv. Inc.*, 50 F.3d 723, 727 (9th Cir.1995).[5] The yacht was stowed on the *Sea Eagle's* deck.

Plaintiff-appellee SNC S.L.B. ("SNC"), a foreign corporation with a place of business in St. Tropez, France, was the consignee named in the bill of lading for the yacht. SNC, in turn, had insured the yacht with the Institute of London Underwriters, a business entity with an office and place of business in London. Plaintiff-appellee Gilles Bentin is the manager of SNC S.L.B. in Marseilles, France. SNC is subrogor, and the Institute of London Underwriters is the subrogee, of the claim at issue. In April 1992, SNC and Gilles Bentin brought this action to recover the cost of the damaged yacht, claiming that the *Sea Eagle* had "unreasonably deviat[ed] from the contract of carriage [by unloading the yacht at Lisbon] and the defendants are, therefore, strictly liable for the damage to the [yacht]." The defendants denied that they had unreasonably deviated from the contract of carriage, and that "the maximum liability of defendant, if any, is $500 per package ... as agreed to in the provisions of the bill of lading and under the provisions of [COGSA]."

carried on or under deck, to carriage of goods between U.S. ports or between non-U.S. ports, before the goods are loaded on or after they are discharged from the vessel....

COGSA itself requires that all outbound bills of lading include a "clause paramount" stating that the contract is governed by the provisions of COGSA. *See* 46 U.S.C.App. § 1312; *see also* GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 3–44, at 185–86 (2d ed. 1975).

**5.** Paragraph 9 of the bill of lading reads in relevant part as follows:

9. STOWAGE ON DECK. Goods stowed in any covered-in space or loaded in a container, van or trailer carried on deck shall be deemed to be stowed under deck for all purposes, including ... the Carriage of Goods by Sea Act....

*See also, supra* note 4.

At a non-jury trial, the plaintiffs claimed that, because Sea–Land attempted to transfer the yacht at a port that it normally did not use, Sea–Land had unreasonably deviated from the contract of carriage. Sea–Land argued, in turn, that the plaintiffs were on notice that Sea–Land's feeder vessels called at various ports on the way to Marseilles,[6] usually at Algeciras, but sometimes Lisbon, and that cargo was often transferred onto other feeder vessels at those intermediate ports. Sea–Land asserted, therefore, that the unloading of the yacht at Lisbon was not a deviation at all, much less an unreasonable one. In addition, it argued that, as an American-flag carrier, it was required to assist the government in a national security emergency. In the defendants' view, any resulting deviation (if it could be called that) was appropriate and necessary and therefore ought not to be a basis for depriving the carrier of the $500 limitation of liability provided for in the contract and under COGSA.

Ruling in favor of the plaintiffs in an Opinion and Order filed February 26, 1996, *SNC S.L.B. v. M/V Newark Bay*, No. 92 Civ. 2375, 1996 WL 82384 (S.D.N.Y. Feb. 27, 1996), the district court found that Sea–Land had not informed the plaintiffs of the possibility that the yacht could be transferred from one feeder vessel to another in Lisbon; that Sea–Land knew that the port facilities in Lisbon were inadequate for that task and would place the yacht at foreseeable risk during the transfer; and, therefore, that Sea–Land had "unreasonably deviated," thereby abrogating the contract of carriage and its $500 limitation of liability and making it liable for the full damages sustained by the plaintiff.

Following the district court's decision on liability in favor of the plaintiffs, the defendants moved for a new trial pursuant to FED.R.CIV.P. 59.[7] After hearing oral argument, the district court denied the defendants' motion. Following an evidentiary hearing on the issue of damages, the court on June 7, 1996, awarded the plaintiffs $257,142 (the fair market value of the yacht prior to being dropped less its salvage value) plus pre-judgment interest from January 3, 1991. This appeal followed.

## II.

Section 3(2) of COGSA, 46 U.S.C.App. § 1303(2), imposes a duty on a carrier to properly load, carry, and discharge shipped goods. As Judge Friendly observed in a leading case, "[i]n order to bring itself within [the terms of section 3], plaintiff has the burden, which remains with it throughout the case, of proving that the goods were damaged while in the carrier's custody[,]" and "[i]f plaintiff carries this burden, it establishes a *prima facie* case for recovery and will thus be entitled to prevail unless the carrier brings itself within one of the exceptions set forth in [section 4 of COGSA]." *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351–52 (2d Cir.1981) (citation and quotation marks omitted).[8] Because Sea–Land does not dispute that the yacht was delivered in good condition or that it was discharged in damaged condition, the burden rests on Sea–Land to establish the application of one of the exceptions provided in section 4 of COGSA.

Sea–Land argues that its liability is limited to the $500 limit established in § 4(5) of COGSA, which provides, in pertinent part, that

> [a] new trial may be granted to ... the parties ... in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States....

---

**6.** Paragraph 3 of the bill of lading reads in relevant part as follows:

> 3. SCOPE OF VOYAGE. The voyage herein contracted for shall include ports in and out of the advertised geographical usual or ordinary route or order....

Although this provision would appear to make any geographical deviation virtually impossible, "courts have indicated that such a clause must be construed or limited only to authorize reasonable departure from the normal route." GILMORE & BLACK 3–40, at 178.

**7.** Rule 59(a), provides, in pertinent part, that

**8.** Section 4 of COGSA provides a long list of exceptions to carrier liability including, inter alia, "[f]ire, unless caused by the actual fault or privity of the carrier," 46 U.S.C.App. § 1304(2)(b); "[a]ct of God," 46 U.S.C.App. § 1304(2)(d); and "[a]rrest or restraint of princes, rulers, or people, or seizure under legal process," 46 U.S.C.App. § 1304(2)(g).

[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ... or ... per customary freight unit ... *unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.* This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

46 U.S.C.App. § 1304(5) (emphasis added). Because the shipper chose not to declare the value of the yacht in the bill of lading, Sea–Land asserts, its liability is limited to $500. The plaintiffs concede that they did not insert a value in the relevant part of the bill of lading, but they argue that the general maritime law doctrine of "unreasonable deviation" deprives a carrier of the COGSA limitation of liability where, as they allege happened here, the carrier "unreasonably deviates" from the contract of carriage and thus places the cargo at risk.[9]

On appeal, Sea–Land does not contest the district court's finding that the transfer at Lisbon was a "deviation," Brief for Appellant at 20, but it does contest the court's finding that the deviation was "unreasonable." In the alternative, it urges us to reconsider and overturn the general maritime law doctrine of "unreasonable deviation" as an outmoded and unjustified exception to the plain requirements of COGSA.

■ We review a district court's findings of fact for clear error, *see* FED.R.CIV.P. 52(a), and reverse only when we are left with the "firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see also EEOC v. Local 638,* 81 F.3d 1162, 1174 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 333, 136 L.Ed.2d 246 (1996).

### A. *"Unreasonable Deviation" Under COGSA*

■ Under the general maritime law, a vessel is said to "deviate" when it leaves its planned or customary course or itinerary. *See, e.g., Hostetter v. Park,* 137 U.S. 30, 40, 11 S.Ct. 1, 4, 34 L.Ed. 568 (1890); *see also General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes,* 706 F.2d 80, 84 (2d Cir.1983). The district court found that because Lisbon is not a customary port of call for Sea–Land vessels, and "the [p]laintiffs were not aware that the *Cover Girls* would be carried to Lisbon or discharged and restowed there," Sea–Land had indeed deviated. On appeal, Sea–Land does not challenge this finding.

The question remains, however, whether the deviation found by the district court was "unreasonable" or "unjustifiable." Courts will deprive a carrier of the benefit of contractual limitations of liability for damage to goods only when a vessel *unreasonably* deviates, usually in a geographic sense, from the terms of the contract. *Italia Di Navigazione, S.P.A. v. M.V. Hermes I,* 724 F.2d 21, 22 (2d Cir.1983); *see also The Propeller Niagara v. Cordes,* 62 U.S. (21 How.) 7, 28, 16 L.Ed. 41 (1858); GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 3–44, at 176–83 (2d ed. 1975) ("GILMORE & BLACK"). The general maritime law of deviation was partially codified in 1936 when Congress enacted COGSA, the domestic implementation of the International Convention for the Unification of Certain Rules Relating to Bills of Lading (the "Hague Rules"), Aug. 25, 1924, 51 Stat. 233, T.S. No. 931, 120 L.N.T.S. 155, an international agreement to which the United States became a party in 1936.[10] *See Spartus Corp. v. S.S. Yafo,* 590 F.2d 1310, 1313, 1315–16 (5th Cir.1979) (setting forth history of deviation doctrine and of COGSA). Section 4(4) of COGSA, the statute's only provision on deviation, provides that

[a]ny deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or

---

**9.** The general maritime law is "a species of judge-made federal common law." *Yamaha Motor Corp., U.S.A. v. Calhoun,* —— U.S. ——, ——, 116 S.Ct. 619, 620, 133 L.Ed.2d 578 (1996).

**10.** The text of the Hague Rules and COGSA are not identical because, in drafting COGSA, Congress chose to add language to the Hague Rules. *See* GILMORE & BLACK § 3–24, at 143–44.

of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

46 U.S.C.App. § 1304(4) (emphasis in original).[11] The survival of the general maritime law doctrine of unreasonable deviation seemed uncertain for a time after the enactment of COGSA, however. COGSA does not explicitly state the consequences, if any, of an unreasonable deviation on the statute's $500 limitation of carrier liability.

The uncertainty over the survival of the unreasonable deviation doctrine under COGSA has since largely been resolved. The first reported case to determine the applicability of COGSA's $500–per–package limitation in the event of a deviation found that the language in § 4(4) did not eliminate the pre-COGSA doctrine of "unreasonable" or "unjustifiable" deviation. *Jones v. The Flying Clipper,* 116 F.Supp. 386, 391 (S.D.N.Y.1953) (holding that the $500 limitation did not apply in the event of an unreasonable or unjustifiable deviation). Without a clear expression of a congressional intent in the language of the statute or in its legislative history to eliminate the doctrine, Judge Edward Weinfeld refused to read the statute to eliminate a principle so "firmly entrenched in maritime law." *Id.* at 389. Moreover, Judge Weinfeld reasoned, absent an exception to COGSA's liability limitation in cases of unreasonable deviation, a carrier would be free to "reckless[ly] ... violate the terms of [a] bill of lading, knowing that it cannot be called upon to pay more than $500 per package." *Id.* at 390.

The majority of courts have followed the lead of Judge Weinfeld in holding that an unreasonable or unjustifiable deviation "so change[s] the essence of the agreement as to effect its abrogation[,]" *id.* at 390, thereby depriving the carrier of the benefits of the $500–per–package limitation of liability contained in COGSA and in the contract of carriage and permitting the "[plaintiff] ... to recover [its] full losses." *Id.* at 391; *see, e.g., Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer,* 422 F.2d 7, 18 (2d Cir.1969) (adopting the holding of *The Flying Clipper* without elaboration); *Nancy Lykes,* 706 F.2d at 83 ("section [4(4) of COGSA] clearly implies that any *unreasonable* deviation is to be treated as a breach of COGSA and the contract of carriage" (emphasis in original)); *Aetna Ins. Co. v. M.V. Lash Italia,* 858 F.2d 190, 192 (4th Cir.1988); *C.A. La Seguridad v. Delta S.S. Lines,* 721 F.2d 322, 324 (11th Cir.1983); *Nemeth v. General S.S. Corp.,* 694 F.2d 609, 612–13 (9th Cir.1982); *Searoad Shipping Co. v. E.I. duPont de Nemours & Co.,* 361 F.2d 833, 835–36 (5th Cir.1966). *But see Atlantic Mut. Ins. Co. v. Poseidon Schiffahrt, G.m.b.H.,* 313 F.2d 872, 874 (7th Cir. 1963) (holding that an unreasonable deviation does not deprive carrier of the $500–per–package limitation).

### B. *"Unreasonable Deviation" in the Instant Case*

◼ We have held that the reasonableness of a deviation will "depend[ ] on an assessment of all the surrounding circumstances," *Nancy Lykes,* 706 F.2d at 85, and that "a deviation is unreasonable ... when, in the absence of significant countervailing factors, the deviation substantially increases the exposure of cargo to foreseeable dangers that would have been avoided had no deviation occurred," *id.* at 86. The district court in the instant case "base[d] its conclusion that the deviation to Lisbon was unreasonable on the substantial evidence that the deviation subjected the cargo to foreseeable dangers that would have been avoided if no deviation from the regular relay port of Algeciras had occurred." *SNC S.L.B.,* 1996 WL 82384, at *8. Our review of the record leads us to the firm conclusion that the evidence does not support the court's finding that the yacht was placed in foreseeable and avoidable danger by being transferred from one feeder vessel to another at Lisbon instead of

---

11. The last part of this section, from the proviso onward, was added by Congress when it adopted the Hague Rules. The intention was to provide that a deviation solely to increase the profit of the carrier would not be considered a reasonable deviation, even if the deviation were "reasonable" as far as the carrier was concerned. *See* GILMORE & BLACK, § 3–40 at 179.

at Algeciras. Accordingly, we hold that the deviation was not unreasonable.[12]

The district court found, and the parties do not dispute, that the yacht needed "skilled handling" when transferred from one vessel to another. To support its finding that the "deviation subjected the cargo to foreseeable dangers that would have been avoided if no deviation ... had occurred," the court relied on the testimony of Brian Fitzgibbon, Sea–Land's general manager of vessel operations and planning for the Atlantic Division. Fitzgibbon testified that Sea–Land generally does not favor Lisbon as a transhipment port because it has a reputation as a "labor problem" port and that, had he known that the feeder vessel carrying the yacht would be rerouted to Lisbon, he would not have accepted the yacht for shipment as he "wasn't sure what might happen to the cargo." When these statements are examined in the full context of Fitzgibbon's trial testimony, however, it is clear that they do not support the district court's finding that transfer at Lisbon posed foreseeable risks.

Fitzgibbon testified that Lisbon is a "labor problem" port in the course of explaining why Sea–Land did not use Lisbon as a feeder port; he was not describing the port's competence to unload cargo that required skilled handling and specialized equipment.

[Defendants' Counsel]: The Port of Lisbon, does it have facilities for handling break-bulk cargo such as a yacht on a rack?

[Fitzgibbon]: Well, Lisbon is a major port in Portugal, and as, of course, any major port, will have the facilities ... to handle the cargo such as that. In fact, Lisbon receives boats and things of that nature, yes.

[Defendants' Counsel]: Pleasure boats?

[Fitzgibbon]: Pleasure boats.

[Defendants' Counsel]: Have Sea–Land's mother vessels also gone into Lisbon?

[Fitzgibbon]: I think it's once or twice we put another vessel in there. *Lisbon has a reputation, your Honor, as being a "labor problem" port.* And therefore, that's one of the reasons it wasn't a feeder port, I think.

(Emphasis added.) Nothing in the record suggests, much less proves, that Sea–Land or anyone else regarded the alleged labor problems at Lisbon's port as posing an unreasonable risk in the transfer of the yacht.

The district court also relied on Fitzgibbon's statement that, if he had known that the feeder vessel was going to be routed to Lisbon, he would not have accepted the yacht for shipment because he was not "sure what might happen to the cargo." However, the context of that particular statement reveals that Fitzgibbon's uncertainty arose from the "massive" re-routing of Sea–Land vessels due to Operation Desert Shield; he was not commenting on the risk of damage to cargo transferred at Lisbon.

[Plaintiffs' Counsel]: My question is: Knowing that you're ... being affected by the Desert [Shield]—
You were aware of that, weren't you, at the time that this cargo was booked in late November of 1990?

[Fitzgibbon]: To be honest, I can't recall when I first knew that or whether—I certainly wouldn't be relating one movement of one container of cargo to the pretty massive issues involved in Desert [Shield], so I can't answer that question honestly, your Honor.

[Plaintiffs' Counsel]: But the cargo wasn't sent to another port of call, Lisbon, overnight, was it? I mean, you knew ahead of time that you were having trouble with Algeciras because of congestion, and you had other feeder vessels serving the Middle East. You were sailing along on your way to Algeciras, and then you were outside of Lisbon. You didn't say, "I've got to turn left and go here, because I just got word that we sent all

---

12. We do not reach Sea–Land's alternative argument that, as an American flag carrier, it had no choice but to deviate due to its Desert Shield obligations. *Cf. Spartus Corp.,* 590 F.2d at 1313 (finding deviation unreasonable even though Is-

raeli government exerted "moral pressure" on Israeli vessel to discharge the plaintiff's goods at unscheduled port in order to pick up certain military supplies and return them to Israel).

of our feeder vessels to the Middle East."

[Fitzgibbon]: I think it's honest to say, your Honor, that *if I had known we were doing such a thing with the feeders and what-have-you, that I probably would have refused the cargo, on the grounds that I wasn't sure what might happen to the cargo.*

[Plaintiffs' Counsel]: So the whole point here is that my question is: This was not a customary voyage, by any stretch of the imagination, was it?

[Fitzgibbon]: [Yes,] I see a deviation. Of course, we provide the service. Once we take cargo, we'll provide the service.

(Emphasis added).

■ Accordingly, when examined in context, the two statements on which the district court relied do not support its finding that Sea–Land, or anyone else, considered Lisbon a port in which it was risky to transfer cargo such as the yacht at issue here. In fact, much evidence was presented to show Lisbon's competence to handle such transfers, although the district court chose not to credit this testimony. We defer to the court's decision not to credit the extensive evidence showing that Lisbon was a reliable port, recognizing that it is not our role to substitute our view of the evidence for that of the district court. "In deference to the unchallenged superiority of the district court's fact finding ability, Rule 52(a) commands that a trial court's findings of fact 'shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.'" *Salve Regina College v. Russell,* 499 U.S. 225, 233, 111 S.Ct. 1217, 1222, 113 L.Ed.2d 190 (1991). We merely conclude that the evidence on which the district court *did* rely did not support the finding that a transfer at Lisbon placed the cargo at undue risk and, accordingly, that the deviation to Lisbon was unreasonable.[13]

Because we hold that the record does not support the district court's finding that the

deviation imposed an unreasonable risk to the yacht, we do not consider Sea–Land's alternative argument, that the time is ripe for the federal courts to reconsider and overturn the general maritime law doctrine of unreasonable deviation. Quite apart from the doctrine's venerability, we have only recently held that "exposing carriers which engage in unreasonable deviations to the risk of full liability has the salutary effect of discouraging such deviations.... [and w]e see no reason ... to abandon a rule the ultimate effect of which is to preserve and enforce the underlying policies of COGSA." *Nancy Lykes,* 706 F.2d at 87–88; *see also Encyclopaedia Britannica,* 422 F.2d at 18; *Lash Italia,* 858 F.2d at 192; *La Seguridad,* 721 F.2d at 324; *Nemeth,* 694 F.2d at 612–13; *Searoad Shipping,* 361 F.2d at 835–36; *The Flying Clipper,* 116 F.Supp. at 389–90 (finding that neither COGSA's text nor its legislative history evinces a congressional intent to replace a doctrine so entrenched in general maritime law with a rule that does little to dissuade carriers from unreasonably deviating from the terms of their contracts of carriage).

### III.

For the reasons stated above, we conclude that the district court's finding that the attempt to transfer the yacht at Lisbon placed the yacht at unforeseeable risk was clearly erroneous, and its conclusion that the deviation was therefore "unreasonable" was error.

Accordingly, the judgment of the district court is vacated and the cause is remanded with instructions to enter a judgment for the plaintiffs that limits their recovery to the $500 provided by the provisions of the contract of carriage that incorporates COGSA.

---

**13.** It would be an exercise in 20–20 hindsight to conclude from the fact that the yacht was dropped while being unloaded at Lisbon that Sea–Land's use of Lisbon to transfer the yacht

was unreasonable. In any event, yachts are regularly dropped at ports throughout the world. *See supra* note 1.